**FRANKLIN COUNTY DISTRICT BOARD OF HEALTH, Appellee,**

v.

**PAXSON, Defendant/Third–Party Appellee; Board of Education of South–Western City Schools, Third–Party Defendant Appellant.**

[Cite as *Franklin Cty. Dist. Bd. of Health v. Paxson,*
152 Ohio App.3d 193, 2003-Ohio-1331.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 02AP–727.

Decided March 20, 2003.

194

196

Ron O'Brien, Franklin County Prosecuting Attorney, and Joseph R. Durham, Assistant Prosecuting Attorney, for appellee.

Goldman & Braunstein, Michael Braunstein and Beth M. Miller, for defendant/third-party appellee.

Schottenstein, Zox & Dunn, Stephen J. Smith and Brian M. Zets, for third-party defendant-appellant.

BROWN, Judge.

{¶ 1} South–Western City Schools, Board of Education ("South–Western"), third-party defendant-appellant, appeals from a judgment of the Franklin County Municipal Court, Environmental Division, denying its motion to dismiss and granting a permanent injunction against it.

{¶ 2} Andrew L. Paxson, defendant/third-party plaintiff-appellee, is the owner of real property in Grove City, Ohio. Paxson and his family moved into a house on the property in 1992 and installed a leach-bed type household sewage disposal system. Shortly after moving in, Paxson also bought a triangular piece of adjoining property behind his own property. The rear portion of Paxson's property is in a flood plain, and Paxson, as well as his neighbors, has experienced flooding problems since he moved onto the property. Following a heavy rain above one inch, ponding would occur, draining within two to four days into underground drainage tile Paxson had installed. When Paxson bought his property, a farmer owned the 109 acres behind Paxson's property. In 1997, the farmer sold the property to a real estate company, who then sold it in 1998 to South–Western, who planned to build several schools, parking lots, athletic fields, and other structures on the property.

{¶ 3} In the summer of 2000, South–Western began construction of a new school on the property. Prior to the construction, Mike Bobby, quality assurance manager for South–Western, attempted to obtain an easement to help convey storm water from the Weygandts, who owned 40 acres next to South–Western's property. The Weygandts refused. Bobby also attended a meeting with land-

owners, including Paxson, in July 2000, to discuss concerns regarding the construction of the school. The landowners were concerned about drainage, which South–Western alleges it tried to address. South–Western claims that before it could investigate the concerns, Paxson retained legal counsel, thereby ending any informal discussion. Without help from the landowners, South–Western claims that it had to design and build a three- to four-acre retention pond to hold excess water. Kleingers & Associates ("Kleingers") was hired by South–Western's architecture firm to design the pond. Steven Korte, an engineer for Kleingers, was project manager for the pond. The pond had a 25–inch diameter pipe that discharged water directly at the rear of Paxson's property when the pond was full beyond its capacity. Construction of the pond was completed in November 2000.

{¶ 4} Paxson alleges that following construction of the retention pond, he began to experience excessive standing water. The problem intensified until Paxson had continuous standing water. As a result, Paxson claims his household septic system leach bed became completely saturated and stopped operating.

{¶ 5} On January 18, 2002, the Franklin County District Board of Health ("board of health"), plaintiff-appellee, filed a complaint for injunctive relief against Paxson, alleging that his household sewage disposal system was discharging sewage onto the surface of the ground. The complaint requested that the trial court declare Paxson's property to be a nuisance and permanently enjoin and restrain Paxson from maintaining the condition. On February 7, 2002, Paxson filed a third-party complaint against South–Western, alleging that South–Western altered the drainage pattern on his property and unreasonably increased the amount of surface water flowing onto his property. The third-party complaint also alleged that unless South–Western was restrained or enjoined from continuing the ongoing drainage activities, Paxson would suffer irreparable harm. Paxson prayed that the trial court enjoin South–Western from continuing the ongoing drainage activities and from maintaining the present drainage conditions. On February 25, 2002, South–Western moved to dismiss the third-party complaint, claiming that it was not properly joined as a third-party defendant and that the claims were already litigated and settled by the parties in *Paxson v. Ruscilli Constr. Co., Inc.*, case No. 01CVHG12–12577, in the Franklin County Court of Common Pleas. In that related case, Paxson and other property owners brought an action for injunctive relief against South–Western and other defendants alleging that the construction of the school caused flooding on their property. The parties agreed to a temporary remedy in that case on September 14, 2001. The defendants in that case agreed to install a pump in the middle of the standing surface water to drain water from the plaintiffs' properties and to plan and execute a more permanent solution. The temporary remedy did not

function as planned, and the defendants continued to search for a permanent solution.

{¶ 6} Prior to a hearing on the preliminary injunction, Steve Korte, who testified as an expert on behalf of South–Western, redesigned the method through which the pond would release water. This method, referred to as "Option C," sealed the old outlet pipe and ran a new 1,700– to 1,800–foot outlet pipe from the front of the retention pond, under the adjoining roadway, Big South Run Road, to an existing culvert under the roadway. The new method eliminates any drainage from the retention pond onto Paxson's or his neighbor's properties.

{¶ 7} On March 28, 2002, the trial court began a hearing on the permanent injunctions. At the hearing, Paxson admitted that his property was in violation of the health regulations, as alleged by the board of health. The hearing was continued.

{¶ 8} On April 3, 2002, the trial court denied South–Western's motion to dismiss. The trial court found that South–Western was properly added as a third-party defendant. The court also found that the parties did enter into an agreement in *Paxson v. Ruscilli Construction Co., Inc.*, supra, but that the agreement avoided only the need to proceed with the preliminary injunction in that case and was not an agreement to settle the case.

{¶ 9} The trial court heard more testimony on April 18 and 30, 2002. On June 19, 2002, the trial court granted an injunction to the board of health and to Paxson and ordered that (1) South–Western modify the existing retention pond's run-off design so as to return Paxson's property to a condition that would permit the installation of a lawful household sewage disposal system; (2) South–Western bear the costs of such installation; and (3) South–Western complete such installation no later than September 1, 2002. The judgment was stayed pending appeal. South–Western appeals from the trial court's judgment, asserting the following two assignments of error:

{¶ 10} "1. The trial court erred in its decision denying third-party defendant board of education's motion to dismiss the third-party complaint.

{¶ 11} "2. The trial court erred in its decision issuing a permanent injunction against third-party defendant board of education."

{¶ 12} South–Western argues in its first assignment of error that the trial court erred in denying its motion to dismiss Paxson's third-party complaint. South–Western first asserts that the trial court's decision to deny its motion to dismiss was inapposite to the purposes of Civ.R. 14(A), which provides:

{¶ 13} "(A) When defendant may bring in third party

{¶ 14} "At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him. * * *"

{¶ 15} South–Western argues that Paxson's third-party complaint against it did not depend on the outcome of the board of health's primary complaint, and South–Western's presence was not essential for a complete determination of the controversy between Paxson and the board of health. South–Western contends that Paxson's third-party complaint raised a separate, distinct claim.

{¶ 16} In order to bring a third-party claim under Civ.R. 14(A), the claim must be derivative of the outcome of the main claim, and the third-party defendant must be "secondarily liable". or "liable over." *Renacci v. Martell* (1993), 91 Ohio App.3d 217, 220, 632 N.E.2d 536. A third-party claim is inappropriate where the right or duty set forth in the third-party complaint alleged to have been violated does not emanate from the plaintiff's claim but exists wholly independent of it. Id., citing *Southeast Mtge. Co. v. Mullins* (C.A.5, 1975), 514 F.2d 747, 750. Thus, "[i]n order to be the proper subject of a third-party action, the alleged right of the defendant to recover, or the duty allegedly breached by the third-party defendant, must arise from the plaintiff's successful prosecution of the main action against defendant." Id. at 221, 632 N.E.2d 536. Civ.R. 14(A) does not allow a third-party complaint to be founded on a defendant's independent cause against a third-party defendant, even though arising out of the same occurrence underlying plaintiff's claim. *State Farm Mut. Ins. Co. v. Charlton* (1974), 41 Ohio App.2d 107, 70 O.O.2d 101, 322 N.E.2d 333. Impleader under Civ.R. 14(A) cannot be used to combine all claims tangentially related to one another. *Renacci*, supra.

{¶ 17} In its complaint and request for injunctive relief, the board of health alleged that Paxson's property constituted a nuisance because his septic system was inoperable and discharged sewage onto the surface. The board of health prayed for the court to declare that the conditions on Paxson's property constituted a nuisance, to order Paxson to cease discharging sewage onto the surface and remedy the condition, and to order Paxson to incur all costs in remedying the condition. Paxson alleged in his third-party complaint against South–Western that South–Western caused the nuisance that was at issue in the underlying claim filed by the board of health against him. Paxson prayed that South–Western be held responsible for all sums that may be adjudged against him in the underlying claim and be required to modify the present drainage conditions so as to prevent further harm upon his property.

{¶ 18} We find that Paxson's third-party complaint was properly brought against South–Western. If South–Western was adjudged to be responsible for the excessive flooding on Paxson's property and the failure of his septic system, as a third-party defendant, South–Western would be secondarily liable for the nuisance claimed by the board of health. With the addition of South–Western, the trial court could completely determine the controversy between Paxson and the board of health. Without the trial court's also determining the issues between Paxson and South–Western, Paxson would have been unable to comply with the injunctive relief ordered to the board of health in the underlying action. The trial court ordered Paxson to cease leaking sewage to the surface of his property and to repair his septic system. However, Paxson could not repair his septic system until his property drained and dried out, which was impossible without also ordering South–Western to cease diverting water onto Paxson's property. The third-party complaint against South–Western was consistent with the purposes of Civ.R. 14(A), which are (1) to promote judicial efficiency by avoiding a circuity of actions, (2) to consolidate separate actions that should be tried in one proceeding, (3) to avoid a duplication of testimony and evidence, and (4) to avoid inconsistent verdicts on identical or similar evidence or testimony. *State ex rel. Jacobs v. Franklin Cty. Mun. Court* (1972), 30 Ohio St.2d 239, 241, 59 O.O.2d 298, 284 N.E.2d 584. Therefore, this argument is without merit.

{¶ 19} South–Western next asserts that the trial court erred in denying its motion to dismiss because Paxson previously agreed to settle the issue concerning the need for injunctive relief. In *Paxson v. Ruscilli Construction Co., Inc.*, supra, the parties, including Paxson and South–Western, agreed to terminate the motion for injunctive relief filed by Paxson. However, we agree with the analysis of the trial court that the termination of that action did not resolve all matters. At the September 4, 2001 hearing in that case, the following exchange took place between the magistrate and Paxson's counsel:

{¶ 20} "MR. BARRETT: I'll add for the record that the parties have discussed this and this only resolves the preliminary injunction issues. It does not resolve the other issues in the case, and the parties are not waiving any damages or rights on those issues.

{¶ 21} "We obviously are going to try to work out a solution after a discussion, but this did not resolve—

{¶ 22} "THE MAGISTRATE: That is understood. Once again, we are here today expressly for the purpose of taking care of the motion for a preliminary injunction. It sounds like that motion has been resolved. * * *"

{¶ 23} This exchange seems to indicate the intent of the parties to leave open the possibility of other remedies and actions against any parties. Paxson's attorney specifically indicated that the agreement did not resolve the other issues

in the case and that Paxson was not waiving any other damages, such as the repair of his septic system. Therefore, this argument is without merit. South–Western's first assignment of error is overruled.

{¶ 24} South–Western argues in its second assignment of error that the trial court erred in its decision issuing a permanent injunction. The standard of review for this court regarding the granting of an injunction by a trial court is whether the trial court abused its discretion. *Perkins v. Quaker City* (1956), 165 Ohio St. 120, 125, 59 O.O. 151, 133 N.E.2d 595. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 25} A permanent injunction is an equitable remedy that will be granted only where the act sought to be enjoined will cause immediate and irreparable injury to the complaining party and there is no adequate remedy at law. *Lemley v. Stevenson* (1995), 104 Ohio App.3d 126, 136, 661 N.E.2d 237; *Strah v. Lake Cty. Humane Soc.* (1993), 90 Ohio App.3d 822, 831, 631 N.E.2d 165. "The purpose of an injunction is to prevent a future injury, not to redress past wrongs." *Lemley* at 136, 661 N.E.2d 237. An essential element of injunctive relief involves a balancing process designed to weigh the equities between the parties. *Rite Aid of Ohio, Inc. v. Marc's Variety Store, Inc.* (1994), 93 Ohio App.3d 407, 418, 638 N.E.2d 1056. In an action for a temporary or permanent injunction, the plaintiff must prove his or her case by clear and convincing evidence. *Younker v. Nationwide Mut. Ins. Co.* (1961), 18 O.O.2d 381, 176 N.E.2d 465, reversed on other grounds (1963), 175 Ohio St. 1, 23 O.O.2d 285, 191 N.E.2d 145; *Baltimore & Ohio RR. Co. v. Pittsburgh, Cincinnati & St. Louis RR. Co.* (1885), 1 Ohio C.C. 100, 1885 WL 3734. "Clear and convincing evidence" has been defined by the Supreme Court in *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 53 O.O. 361, 120 N.E.2d 118:

{¶ 26} "* * * Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal. See *Merrick v. Ditzler* [1915], 91 Ohio St. 256, 110 N.E. 493."

{¶ 27} South–Western first asserts that the trial court abused its discretion by issuing the injunction when Paxson failed to demonstrate by clear and convincing evidence that he would be subject to future irreparable harm. South–Western claims that Paxson offered no evidence that once construction of "Option C" was completed, he would continue to suffer the alleged harm.

However, at the time of the hearing before the trial court, "Option C" had not been completed. Thus, Paxson was still suffering harm at the time of the hearing. At oral arguments before this court, the parties informed the court that "Option C" had been completed, and the retention pond no longer drained water onto Paxson's property. Assuming that "Option C" continues to work as designed, South–Western has complied with the portion of the trial court's injunction ordering South–Western to "modify the existing retention pond's run-off design so as to return defendant third-party plaintiff Paxson's property to a condition that will permit the installation of a lawful household sewage disposal system * * *." Nevertheless, despite South–Western's subsequent remedying of the nuisance in this regard, such does not negate the fact that, at the time of the injunction hearing, Paxson was subject to irreparable harm into the future. This argument is without merit.

{¶ 28} South–Western next asserts that the trial court abused its discretion by issuing a permanent injunction when there was no credible evidence to suggest that South–Western unreasonably altered the natural flow of surface water across Paxson's property or that South–Western proximately caused the alleged nuisance. In *McGlashan v. Spade Rockledge Corp.* (1980), 62 Ohio St.2d 55, 16 O.O.3d 41, 402 N.E.2d 1196, syllabus, the Ohio Supreme 'Court adopted a reasonable use rule for surface water disputes:

{¶ 29} "In resolving surface water disputes, courts of this state will apply a reasonable-use rule under which a possessor of land is not unqualifiedly privileged to deal with surface water as he pleases, nor absolutely prohibited from interfering with the natural flow of surface waters to the detriment of others. Each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, and the possessor incurs liability only when his harmful interference with the flow of surface water is unreasonable. * * *"

{¶ 30} Under the reasonable-use rule, unless the defendant's conduct is unlawful or subject to strict liability, the defendant's liability for interference with surface water flow is controlled by principles of common-law negligence, regardless of whether the plaintiff's cause of action sounds in nuisance or trespass. *Ogle v. Kelly* (1993), 90 Ohio App.3d 392, 396, 629 N.E.2d 495. In this regard, the plaintiff must show that the defendant owed a duty of care, that the defendant breached that duty of care, and that the defendant's breach of duty was the direct and proximate cause of the plaintiff's injuries. According to the Ohio Supreme Court, a breach of duty can be found only if the defendant's interference with surface water flow is unreasonable, which is determined "by balancing the gravity of the harm caused by the interference against the utility of the [defendant's] conduct." *McGlashan,* supra, at 60, 16 O.O.3d 41, 402 N.E.2d

1196, adopting 4 Restatement of the Law 2d, Torts (1979) 108–142, Sections 822–831.

{¶ 31} In this case, there is no question that South–Western had a duty not to unreasonably interfere with the surface water flow onto Paxson's property. South–Western's arguments center upon only the breach of that duty and proximate cause, and we will address them together. South–Western claims that its interference with the surface water flow was not unreasonable, pointing to the testimony of Korte, who testified that because of the flooding concerns downstream from the school property, he used a conservative approach in designing the retention pond, using a widely used computer program. Because of these concerns, he used an even more conservative approach than the Franklin County Engineer's Office requires for flow rate. He said the approach on the release rate was not to increase or worsen the flooding problems off the school property. However, he also agreed with the testimony of Paxson's expert, Dr. Vincent Ricca that although the peak flows decreased, the pond discharged a larger volume of water over a much longer period of time. He stated that there were more hard surfaces on the post-construction area that drained into the pond than there were preconstruction. He verified that there were also soft surfaces, such as the athletic fields, that had underground tiles that drained into the pond. Korte further testified that during construction, South–Western eliminated the "Smith swale," which provided another drainage route prior to construction. Thus, any drainage that had exited via the "Smith swale" prior to construction drained into the pond post-construction. Approximately 20 percent more acreage drained into the pond post-construction than preconstruction. Korte also admitted that although he was aware of the lack of positive drainage downstream from Paxson's property, no changes were made to increase the positive drainage.

{¶ 32} Dr. Ricca testified that prior to construction, 15 percent of the property drained out of the outlet where the retention pond is currently situated. Post-construction, 49 percent of the property contributed to the same flow point and discharged onto Paxson's property. He said that not only was more of the property contributing to that flow point, but the quantity of water coming from that property greatly increased due to the impervious parking lot surfaces, athletic fields, and roofs. Dr. Ricca stated that prior to construction of the school, rainwater drained into Paxson's property for an hour; however, with the retention pond, it drained for several days, which kept the soil constantly saturated.

{¶ 33} With regard to the septic system, Dr. Ricca explained that if the ground near the leach bed of a septic system were saturated, the water could not leave the septic system. In order for the septic system to work, the soil around it must dry out between rain events, which the constant flow rate from the pond

prevented. He admitted that he did not examine or test the septic system. He stated that if the conditions on the property change, the current septic system may return to working order. His opinion was that if the groundwater were lowered around the septic system, it would start working again. He admitted that there could be other reasons for the septic system to fail, including a structural problem, a draining problem downstream, or water from another development upstream. However, Dr. Ricca discounted the other possible causes of the septic system failure. Downstream, there seemed to be sufficient drainage, and upstream, the other developments had their own drainage system and retention ponds. He also said that because of the flow of water from the retention pond, a new septic system would not function properly.

{¶ 34} Dr. Ricca also opined that based upon the facts that the land used to be usable farmland, that all of the houses in that area have basements, and that the health department at one time approved the use of septic systems in that ground, Paxson's property was much wetter and had a higher water table than it had prior to the construction of the school. He also testified that the flooding of basements in the area after the construction of the school indicated hydrostatic pressure around the basements as a result of saturated soil. Further, he explained that although the peak flow rate had not increased, the quantity of water and duration of flow on Paxson's property had increased as a result of the school construction. However, he admitted that he had not measured the quantities.

{¶ 35} Dr. Ricca further testified that when he examined the property a few weeks prior to the hearing, there was standing water on Paxson's property. There were trees in the water, which indicated to him that the land had been drier at some point in order for the roots to establish themselves. During his examination of the area, he saw other property adjacent to Paxson's property that was dry, leading him to conclude that the land may drain and dry out between rain events.

{¶ 36} Harry Kallipolitis, the storm water coordinator for the division of surface water for the Ohio Environmental Protection Agency ("OEPA"), also testified. In his capacity with the OEPA, Kallipolitis inspected the retention pond and school property over 12 times. He stated that prior to construction, the Paxson property was mostly mowed and free from standing water. However, after construction of the pond, he noticed an extensive footprint of a wetted perimeter of standing water. Kallipolitis stated that, after working for the OEPA for nine years and inspecting over a thousand retention ponds, the pond in the present case was:

{¶ 37} "[B]y far the worst case that I've seen where—resulting in positive drainage below the discharge pipe. There was very little positive drainage.

Most of the drainage that was discharging—most of the storm water was—discharging from the pond was creating large impoundments below the pond with very little—minimal positive drainage away from the site, by far the worst that I've seen in the nine years that I've been with the Ohio EPA."

{¶ 38} Paxson also testified. He said that after moving into the home, he installed drainage tile around his house and in front of it to help positive drainage, which alleviated some of the problems. He stated that any rain above an inch would result in ponding in his backyard. After such a rain, the land would drain in two to four days. Prior to the construction of the retention pond, he had never experienced any problem with his septic system or water well, he mowed the land behind his house, and his children played on the land. After the pond was constructed, the water steadily rose on the property. Whenever it would rain a half-inch, his backyard would fill with water, and it would not drain. He said water had been sitting on the property for two years. Paxson also testified that after the previous landowner of South–Western's property flattened out the land with a bulldozer in 1997 or 1998, his flooding problems totally stopped. At no time prior to the pond being built had he ever been forced to move from his home. He added that Bobby had told him that there would be only a trickle of water coming from the discharge pipe onto his land. Bobby admitted that based upon what the engineers had told him, he told the Paxsons that the construction would not be detrimental and most likely would help their drainage problems.

{¶ 39} Patricia Paxson, Andrew Paxson's wife, testified that they had drainage problems on the property prior to the school's being built. She said the only significant flooding problem in the past had been after ten inches of snow melted rapidly, but it had drained in two days. Patricia Paxson also testified that prior to the pond's being constructed, the drainage on their property was manageable. After approximately an inch or inch and one-half of rain, puddles would form in their yard that would dry within two or three days. She said that she started having problems with her septic system in the backyard in the spring of 2001 and in the house in the fall of 2001.

{¶ 40} After reviewing the evidence and above testimony, we find that the trial court did not abuse its discretion in finding that South–Western unreasonably altered the flow of surface waters and that such actions proximately caused damage to Paxson's property. We do not dispute the evidence that the Franklin County Engineer's Office approved the construction plans, that the retention pond's flow rates were well within the county's guidelines, and that the pond was designed using a computer program that was well accepted in the industry for such uses. However, such facts are of little consequence and comfort when examining the real-world results of the construction of South–Western's retention

pond. Despite its best efforts, the blessing of the Franklin County Engineer's Office, and its use of a popular computer program, South–Western failed to design a retention pond that reasonably handled the surface waters flowing from its borders and onto Paxson's property. Paxson testified that after 1998, his drainage problems had ceased after South–Western's property was flattened by the prior owner. Both he and his wife testified that, even before 1998, whenever a significant rain event would occur, the resulting puddles and saturation would dry within two to four days. The pooled water after severe precipitation had never before stood above ground for more than this short period of time prior to the construction of the pond. Kallipolitis substantiated that, prior to the pond's construction, Paxson's property was mostly mowed and free from standing water. However, after construction of the pond, Kallipolitis noticed an extensive footprint of a wetted perimeter of standing water. The Paxsons also testified that after the construction of the pond, their toilet began to leak at its base, and the water began to smell foul, neither of which had ever occurred before the pond was built. Further, Dr. Ricca testified that prior to construction, various portions of South–Western's land had various drainage points along its borders. However, after construction, many of those points had been reduced to a single outflow point onto Paxson's property. This resulted in a vastly increased output of water onto Paxson's property, as well as a longer period of release. South–Western's expert, Korte, agreed that the output of water onto Paxson's property increased and was discharged over a longer period of time after the pond was constructed.

{¶ 41} Certainly, the pond's intended purpose of releasing water in a metered fashion may have been fulfilled, but such plan did not account for the peculiar properties of and defects in Paxson's property. Although the retention pond itself may have been designed in accordance with various standards, the problem seems to be that the entire concept of using a retention pond that drained water onto this specific piece of property was an unreasonable and faulty plan in and of itself, given the fact that the retention pond would constantly release greatly increased amounts of water onto a single point on Paxson's property without allowing the historical drying-out periods it had benefited from in the past. Paxson's particular property required drying-out periods between events in order to sustain a septic system and had a history of poor positive drainage. Korte admitted that it eliminated a prior point of discharge at "Smith swale" and took no steps to increase the positive drainage on Paxson's property before constructing the pond. South–Western's decision to drain the retention pond onto Paxson's property in the manner it chose proximately caused an unreasonable interference of surface flow, given the particular characteristics of Paxson's property. To illustrate this rationale, consider the simple, yet ridiculous, hypothetical situation in which South–Western decides to discharge the pond water by placing the drainage pipe over the top of a house that closely

borders its property. Though absurd, obviously, computer calculations, Franklin County detention requirements, and "conservative" flow rates would be rendered meaningless by the poor placement of the drainage pipe in this exaggerated example. Thus, despite South–Western's best-laid plans, the design concept utilized was unreasonable and defective.

{¶ 42} In addition, South–Western attacks Dr. Ricca's opinions because he failed to perform a more detailed study of Paxson's property, never assessed the drainage patterns of the land upstream or downstream from Paxson's property, and did not review topographical maps. However, Dr. Ricca specifically testified that he discounted the other possible causes of drainage problems. He stated that downstream there seemed to be sufficient drainage, and upstream the other developments had their own drainage systems and retention ponds. Based upon the facts that the land was formerly usable farmland, that all of the houses in that area have basements, and that the health department at one time approved the use of septic systems in that soil type, Dr. Ricca believed that Paxson's property was obviously much wetter after construction of the school and pond. Essentially, South–Western attacks Dr. Ricca's credibility. However, credibility was for the trial court to determine as the trier of fact.

{¶ 43} South–Western also argues that there was no evidence that the failure of the septic system was the proximate result of the standing water. South–Western points out that Dr. Ricca never tested the septic system and did not even bother to look inside the system to see whether it had unrelated structural problems. However, the testimony of Paxson and his wife is very compelling. They both testified that they had never, in the eight years prior to the construction of the retention pond, had any problem whatsoever with their septic system. Paxson testified that besides normal maintenance, the septic system had never needed any repair work. Dr. Ricca corroborated the fact that septic systems could not work in saturated soil, and their leach beds needed to be dry to function properly. The temporal coincidence of the failure of the system with the onset of the drainage problems resulting from the construction of the pond provides a persuasive nexus between the two events to establish that the former was proximately caused by the latter. Therefore, this argument is without merit. For these reasons, we find that the trial court did not abuse its discretion in finding that South–Western unreasonably altered the natural flow of surface water across Paxson's property and that such was the proximate cause of the nuisance.

{¶ 44} South–Western next argues that the trial court abused its discretion by requiring it to install a lawful household sewage disposal system and bear the cost of such installation because this relief is inapposite to third-party practice, the relief sought by the board of health, Paxson's expert evidence, and Ohio law

governing sovereign immunity. Specifically, South–Western contends that the trial court's relief that it install a new septic system ignores the purpose of Civ.R. 14, Paxson's expert, and the provisions of R.C. Chapter 2744.

{¶ 45} We will first address South–Western's argument that the order that it install a new septic system for Paxson is contrary to the testimony of Paxson's expert, Dr. Ricca, as our determination of this issue renders the other arguments moot at this time. This argument is essentially a manifest-weight-of-the-evidence claim. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed.1990) 1594.

{¶ 46} We find that the trial court's determination that a new septic system was required in order to eliminate the nuisance was against the manifest weight of the evidence. Dr. Ricca testified that if the conditions on the property changed, the Paxson's septic system may return to working order. Dr. Ricca then stated, "My guess or opinion at this point would be, if you lower the groundwater around the septic system, it would start working again." Further, in opposing South–Western's motion to dismiss, Paxson attached the affidavit of Donald Morris, the president of Four–D Construction, Inc., in which Morris averred that "[t]he current sewage system is not defective, but cannot operate correctly due to the excessive standing water and the saturation of the leach bed." Morris also averred that "[t]he Paxson sewage system cannot begin to function properly until the school ceases to drain water onto the Paxson property," and "[i]nstallation of a new sewage system on Paxson's property will not alleviate the problem, since the new system would also fail due to the standing water."

{¶ 47} Given these conclusions by Paxson's own expert and affiant, we believe that the broad injunctive relief granted when the trial court ordered South–Western to install a new septic system was premature and against the manifest weight of the evidence. The trial court was exercising its equitable powers in issuing the injunction, and we find that it would be inequitable to require South–Western to replace Paxson's septic system if it, indeed, works properly after his land has drained sufficiently. As of August 2002, the new drainage system was completed, totally eliminating any discharge onto Paxson's property from the retention pond. We do not know the current status of the septic system or the extent to which the property has drained so far. Where the grounds and reasons for which an injunction was granted no longer exist by reason of changed conditions, a court may alter the judgment to adapt it to such changed conditions or set it aside altogether, as where there is a change in the

controlling facts on which the injunction rests. See 42 American Jurisprudence 2d (2000) 555–556, Injunctions, Section 3. This rule applies not only to changes occurring while the action is pending in the court of original jurisdiction, but also to those which occur while it is pending in an appellate court. See *Cleveland v. Division 268 of Amalgamated Assn. of Street Elec. Ry. & Motor Coach Emp. of Am.* (1948), 84 Ohio App. 43, 46, 39 O.O. 93, 81 N.E.2d 310. Thus, we will remand the matter to the trial court for further proceedings to ascertain whether Paxson's septic system is currently in need of replacement or repair as a direct result of South–Western's actions, or to determine when the land will have drained sufficiently to ascertain the operability of the septic system. Therefore, South–Western's second assignment of error is sustained in part and overruled in part.

{¶ 48} Accordingly, South–Western's first assignment of error is overruled, and its second assignment of error is sustained in part and overruled in part. The judgment of the Franklin County Municipal Court, Environmental Division, is affirmed in part and reversed in part, and this matter is remanded to that court for further proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part
and cause remanded.

TYACK and DESHLER, JJ., concur.