IN RE **Robert A. PEACE, Jr.,**
**Jaime L. Peace, Debtors**

**James Vande Ryt, Karen Vande Ryt,**
**Jeff Winningham, Plaintiffs**

v.

**Robert A. Peace, Jr., Defendant**

**Case No. 13–10430**
**Adversary Case No. 13–1041**

United States Bankruptcy Court,
S.D. Ohio, Western Division.

Signed October 2, 2015

Entered October 5, 2015

James E. Kolenich, Cincinnati, OH, for Plaintiffs.

Brian D. Flick, The Dann Law Firm, Cincinnati, OH, for Defendant.

## MEMORANDUM OF DECISION

Jeffery P. Hopkins, United States Bankruptcy Judge

Plaintiffs James Vande Ryt, Karen Vande Ryt, and Jeff Winningham (hereinafter referred to collectively as "the Vande Ryts") filed this adversary action against their former next-door neighbor Defendant–Debtor Robert Peace, Jr. (hereinafter as "Defendant Peace"), seeking a determination that an alleged debt predicated upon water run off damage to their former homestead is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). Following a two-day trial the parties filed post-trial briefs (ECF Nos. 60 and 61) containing citations to the trial transcript (ECF Nos. 56 and 57). This memorandum constitutes the Court's findings of fact and conclusions of law required by Fed. R. Bankr.P. 7052.

*SUMMARY OF DISPUTE*

The Vande Ryts allege in the adversary complaint that the Defendant Peace altered two parcels of land, each bordering

the property where the Vande Ryts resided, resulting in a diversion of surface water that caused significant property damage to their yard and driveway.

### JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334(a) and (b). This proceeding arises in a case referred to this Court by the Standing Order of Reference entered in this District. Pursuant to 28 U.S.C. § 157(b)(2)(I), the determination of the dischargeability of the debt is a core proceeding in which the Court is authorized to enter final judgment. The liquidation of the underlying debt is a related proceeding over which this Court possesses jurisdiction, *see In re McLaren*, 3 F.3d 958, 965–66 (6th Cir.1993)(bankruptcy courts possess jurisdiction to liquidate underlying debt in dischargeability action), and in which the Court is authorized to enter final judgment. *See* 28 U.S.C. § 157(c)(2)(upon consent of the parties bankruptcy court can enter final judgment in related proceedings).[1]

### DOES A DEBT EXIST?

 The Vande Ryts' claim is unliquidated. If so, the threshold issue in a dischargeability action is whether a debt exists. *Lawson Conley (In re Conley)*, 482 B.R. 191, 207 (Bankr.S.D.Ohio 2012); *Weidle Corp. v. Leist (In re Leist)*, 398 B.R. 595, 601 (Bankr.S.D.Ohio 2008). The answer is determined by applicable nonbankruptcy law. *See Grogan v. Garner*, 498 U.S. 279, 283–84, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

 Under Ohio law, liability for interference with the flow of surface water requires proof of negligence. *Franklin Co. Dist. Board of Health v. Paxson*, 152 Ohio App.3d 193, 203, 787 N.E.2d 59 (2003). Did the defendant breach a duty of care that proximately caused injury to the plaintiff? *Id.* With respect to an interference with the flow of surface water, a breach of duty of care occurs only if the interference is unreasonable. *McGlashan v. Spade Rockledge Terrace Condo Dev. Corp.*, 62 Ohio St.2d 55, 60, 402 N.E.2d 1196 (1980). The reasonableness of the interference is determined by balancing the gravity of the harm against the utility of the conduct. *Id.*; *Paxson*, 152 Ohio App.3d at 203, 787 N.E.2d 59.

 For the reasons that follow, Defendant Peace proximately caused injury to the Vande Ryts by unreasonably interfering with the flow of surface water.

### THE PARTIES

Plaintiffs Karen Vande Ryt ("Karen") and Jeff Winningham ("Jeff") are married, and they have a son and stepson, Plaintiff James Vande Ryt ("James"). From 1990 through 2011, Karen and Jeff resided at

---

1. The parties knowingly and voluntarily consented to the entry of a final judgment on all of the claims and defenses asserted in this proceeding. After the lawsuit brought in state court by the Vande Ryts against Defendant Peace was stayed by the bankruptcy filing, rather than seek relief from the automatic stay, the parties consented to this Court's entering final orders and judgment. Indeed, the parties' Joint Pretrial Statement filed in the bankruptcy court states that, if any portion of the adversary complaint was determined to be non core, "consent IS given to the Bankruptcy Judge to enter final orders and judgment." See Doc. 11. *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) and its progeny are not implicated because this action does not involve a "Stern claim." *See Executive Benefits Ins. Agency v. Arkison*, —— U.S. ——, 134 S.Ct. 2165, 2170, 189 L.Ed.2d 83 (2014)("Stern claim" is a core proceeding that could have been brought as a suit at common law). The request for a determination of dischargeability is a core proceeding, but not a suit that could have been brought at common law. The liquidation of the underlying debt is not a core proceeding.

4684 East Miami River Road ("the Vande Ryt Property"). However, in 2007, James purchased the Vande Ryt Property from Karen.

The Debtor, Robert A. Peace, Jr. ("Defendant Peace"), resided next door to the Vande Ryt Property at 4692 East Miami River Road ("the Peace Property") from 2007 through 2013. Defendant Peace purchased the Peace Property from his dad, Robert Allan Peace ("Allan"), who is not a party to this action.[2]

### THE PROPERTIES

The Vande Ryt Property and the Peace Property are side-by-side, as viewed from East Miami River Road, sharing a 290 foot boundary line from front to back. The properties are located on the southeast side of East Miami River Road. A map of the properties, Defendant's Exhibit T, is attached hereto.[3]

Both properties slope upward from the road, being higher in the back than the front. In fact, the properties are located on a hillside. Defendant Peace's aunt, also Allan's sister-in-law, Hester Peace, owns the land behind the properties ("the Uphill Property"). The Uphill Property, where it borders the Vande Ryt Property and the Peace Property, slopes uphill at a one to three slope (one foot vertically for every three feet horizontally). It is a steep slope.

### 2005 CONDITION OF THE PEACE PROPERTY

Allan purchased the Peace Property in 2005 following a foreclosure. At the time of the foreclosure the property was condemnable due to massive water damage. The Peace Property sat lower than the Vande Ryt Property. Surface water naturally gravitated to the Peace Property and collected there. According to Allan: (1) water flowed from the Vande Ryt Property into the basement window well of the Peace Property; and (2) dirt washed down the Uphill Property to the back door of the Peace Property.

### WATERPROOFING BEGINS ON THE PEACE PROPERTY

Beginning in the summer of 2005, Allan began to make significant changes to the Peace Property. At the time, he owned several pieces of earth-moving equipment: a backhoe, an excavator, a skid steer, and a bulldozer. Allan excavated around the foundation of the house, digging down to the footer level. He repaired the foundation, added drain pipes, and back-filled with heavy stone to improve drainage.

### 2005 CONDITION OF THE VANDE RYT PROPERTY

The Vande Ryt Property was free from water damage when the work on the Peace Property began. A photo of the excavation on the Peace Property, Plaintiffs' Exhibit 2, is attached hereto. The photo is taken from the Vande Ryt Property. The photo reveals healthy trees and grass on the Vande Ryt Property. Karen testified that the Vande Ryt Property had never experienced any water damage up to this point in time.

### 2009 CONDITION OF THE VANDE RYT PROPERTY

In 2009, Paul Cooper visited the Vande Ryt Property. Mr. Cooper is the owner of a landscaping business.

Mr. Cooper testified about the condition of the property as follows:

---

**2.** Although Defendant Peace and Allan have the same name, Defendant Peace goes by the name "Robert" and Allan goes by the name "Allan."

**3.** Among other things, the map identifies the properties by street number. The street numbers are written in blue. 4684 identifies the Vande Ryt Property and 4692 identifies the Peace Property.

A: The front yard was decimated. There was no grass to be seen. Mostly it was mud and/or clay. Very few shrubs. There were a few patches of grass here and there. But most of it was just, it was gone.

Q: ... [D]id you have an occasion to continue your inspection of the property up the hill towards the back end of the property?

A: I did.... I observed a lot, a lot of water damage. Deep ruts, they looked like veins in the yard with no, nothing, no soil, no trees.

Q: Were the trees at that point dead?

A: They were predominantly dead. I believe, if my memory serves me, there were 11 to 12 trees that the leaves were almost gone. There were a couple of pine trees where the roots were showing underneath where the [soil] had been washed out of the entire root system.

Karen described the property as a full acre of mud with dead trees. According to Karen and Jeff, it looked like a bomb exploded on the Vande Ryt Property. Plaintiffs' Exhibit 24, attached hereto, is indicative of the condition described.

### DAMAGES TO THE VANDE RYT PROPERTY: TREES, SOIL, AND GRASS

Mr. Cooper testified about the work necessary to restore the Vande Ryt Property. Two pine trees and eleven or twelve deciduous trees needed to be removed and replaced. They were either dead or going to die. Fifty to sixty tons of topsoil needed to be added. Grass needed to be planted. Lastly, to enable the new trees and grass to grow without being washed away by surface waters, a drain tile needed to be installed. Mr. Cooper testified that it would cost $30,000 to complete the remediation.

The record suggests that the Vande Ryt Property may have sustained further damages. For example, there is proof that the driveway was ruined. However, there is no proof of the cost to repair the driveway or quantification of any other damages. Therefore, the Court will limit its analysis to the loss of trees, soil, and grass.

### WHAT CAUSED THE LOSS OF THE TREES, SOIL, AND GRASS?

The Vande Ryts offered the expert testimony of Craig Abercrombie. Mr. Abercrombie works for Abercrombie and Associates, Inc. ("AA"), a civil engineering and land surveying business. Among other things, AA specializes in drainage issues related to private development.

According to Mr. Abercrombie, three separate events caused the damage to the Vande Ryt Property. One event occurred on the Peace Property and two events occurred on the Uphill Property.

1. Creation of an Embankment on the Peace Property

Mr. Abercrombie discovered that a man-made embankment had been created on the Peace Property, along the property line that the Peace Property shares with the Vande Ryt Property. Plaintiff's Exhibit 27A, attached hereto, is a map of the properties that identifies the embankment as a pink line located on the property line between the driveways.[4] According to Mr. Abercrombie, surface water would normally flow over the Vande Ryt Property and onto the Peace Property at the location of the embankment. The embankment redirected surface water traveling toward the Peace Property back onto the Vande Ryt

---

4. Both properties are outlined in yellow. The Peace Property is the property on the right, with a yellow X marked on the property. The Vande Ryt Property is the property on the left.

Property in a concentrated flow that resulted in erosion.

### 2. Creation of a Swale on the Uphill Property

Mr. Abercrombie sent a survey crew to the Vande Ryt Property. The crew used survey equipment to take elevation readings of the surrounding land. Those readings revealed a swale, or ditch, on the Uphill Property behind the Peace Property. The swale, identified by a pink arrow on Plaintiffs' Exhibit 27A, spans the entire width of the Peace Property. The swale collects water coming down the hill, traveling toward the Peace Property, and redirects it to the rear of the Vande Ryt Property. According to Mr. Abercrombie, the swale redirects a substantial amount of water.

### 3. Removal of Trees and Vegetation From the Uphill Property

Upon examination of the properties, Mr. Abercrombie concluded that trees and vegetation had also been removed from the Uphill Property directly behind the Vande Ryt Property. He testified that this diminished the ground's ability to absorb surface water. This increased the volume and velocity of the surface water entering the Vande Ryt Property from the rear and resulted in significant erosion of the Vande Ryt Property.

### 4. Abercrombie Conclusions

In conclusion, Mr. Abercrombie provided his expert opinion concerning the cause of damage to the Vande Ryt Property:

A: My opinion is that the stripping and the reallocation of the storm water tore the plaintiffs' property, signifi-

cantly damaged the plaintiffs' property[.]

His written report draws a similar conclusion: "The additional fill [i.e., embankment] and removal of vegetation play a large role in this increased velocity of storm water, which has resulted in significant erosion on the [Vande Ryt Property]."

### PERSONS LIABLE FOR DIVERTING SURFACE WATER

■ Before examining whether Defendant Peace participated in any of the activities that damaged the Vande Ryt Property, a preliminary question must be answered. Can a person be liable for diverting surface water on property the person did not own at the time of the diversion? The answer is yes.

■ In *McGlashan*, the Supreme Court of Ohio looked to chapter 40 of the Restatement of Torts 2d to determine the reasonableness of an interference with surface water. *McGlashan*, 62 Ohio St.2d at 60, 402 N.E.2d 1196. Chapter 40, entitled "Nuisance," identifies the persons liable as anyone who substantially participates in the activity that caused the interference. *See* Restatement (Second) of Torts § 834 (1979).[5] A person participates "not only when he acts for his own benefit, but also when he acts in the capacity of servant, agent or independent contractor." *Id.* at cmt. c. Therefore, the person need not own the land on which the activity occurred. *See e.g., In re Resource Technology Corp.*, 662 F.3d 472 (7th Cir.2011) ("It is unusual for nuisance to be alleged against someone other than the owner or lessee of the property ... But the key to liability is not ownership; it's control [of the nui-

---

5. Similarly, chapter 40 identifies "possessors of the land" among those who have standing to recover. *See* Restatement (Second) of Torts § 821E (1979). "Possessors" include the owner of any possessory estate and their family members who share occupancy. *Id.* at cmts. c–d. Therefore, Karen, Jeff, and James are each entitled to bring this action.

sance]."")(citing Restatement (Second) of Torts § 834 cmt. c (1979)).

*DID DEFENDANT PEACE SUBSTANTIALLY PARTICIPATE IN THE ACTIVITIES THAT DAMAGED THE VANDE RYT PROPERTY?*

1. Creation of an Embankment on the Peace Property

Karen testified that Defendant Peace built the embankment that Mr. Abercrombie referenced in his testimony. Defendant Peace testified that he built a retaining wall along the property line after he purchased the property from Allan. Karen testified that Plaintiffs' Exhibit 18, attached hereto, is a photo of Defendant Peace taken while constructing the embankment. Plaintiffs' Exhibit 16, attached hereto, is a photo of the completed project. The photos are consistent with the description of the embankment in Mr. Abercrombie's report, which states: "The existing fence line now sits at the toe of the slope, downhill from said embankment." According to Karen, prior to the construction of the embankment the fence line was at the top of a slope that sloped downward, severely, toward the Peace Property.

Defendant Peace substantially, if not single-handedly, participated in the creation of the embankment on the Peace Property.[6]

2. Creation of a Swale on the Uphill Property

Both Karen and Jeff witnessed Defendant Peace and his father Allan digging the swale on the Uphill Property, using earth-moving equipment. According to Karen, her son James discovered Defendant Peace and Allan digging the swale in 2007.

A: [I]n 2007 there were some heavy spring rains and there was a lot of water coming off the hill. And on one particular day [Defendant Peace and Allan] had left their van door open. So my son knew that they were in the back of the yard and noticed that they were digging the swale and explained to me, "Mom, that's where the water is coming from."

Upon making this discovery, Karen contacted the county office of soil and water conservation.

A: [T]hey came out and looked and said it was definitely something that should not be done. They were appalled at the amount of excavation that was occurring.

After that, Defendant Peace and Allan continued to work on the Uphill Property after dark, with lighting on their equipment.

---

**6.** Allan testified that he constructed a "preference" three or four feet away from the property line during his ownership of the Peace Property. The preference redirected surface water flowing from the Vande Ryt Property onto the Peace Property into a catch basin on the Peace Property. The catch basin routed the water to the road. This does not sound like the embankment that Mr. Abercrombie referenced. Mr. Abercrombie's embankment redirected the water onto the Vande Ryt Property, not a catch basin on the Peace Property. Moreover, Defendant Peace conceded that he built a retaining wall on the property line during Defendant Peace's own-ership of the Peace Property. However, even if Allan's preference is the same as Mr. Abercrombie's embankment, Allan and Defendant Peace testified that Defendant Peace assisted Allan with Allan's improvements to the Peace Property during Allan's ownership of the Peace Property. Jeff testified that Defendant Peace and Allan always worked together, never separately, on the Peace Property. Therefore, whether the embankment was constructed during Allan's ownership or Defendant Peace's ownership, Defendant Peace substantially participated in the creation of the embankment.

Defendant Peace and Allan both testified that they did not create the swale. The Court does not find their testimony to be credible. Allan testified that the swale used to be an old cattle trail. By contrast, Mr. Abercrombie stated his opinion that it appeared that someone constructed the swale. Similarly, Mr. Cooper said that the ground around the swale was "built up" eighteen to twenty-four inches high. According to Mr. Cooper: "it looked like somebody … put a mound in there." Plaintiffs' Exhibit 39, attached hereto, is an aerial photo of the properties from 2007. It depicts a large brown area of ground on the Uphill Property behind the Peace Property, consistent with the Plaintiffs' testimony that excavation occurred on the Uphill Property in 2007.

Defendant Peace substantially participated in the creation of the swale on the Uphill Property.

### 3. Removal of Trees and Vegetation From the Uphill Property

Karen and Jeff both witnessed Defendant Peace and Allan removing trees and vegetation from the Uphill Property, using earth-moving equipment.

Defendant Peace and Allan, however, testified that they did not remove the trees and vegetation from the Uphill Property. Again, the Court does not find their testimony to be credible. Defendant Peace's trial testimony contradicted his deposition testimony. At trial, Defendant Peace said that Allan did not do any work on the Uphill Property. In his deposition, Defendant Peace testified that Allan was doing work behind the Vande Ryt Property, which is exactly where Mr. Abercrombie said the trees and vegetation were removed. This suggests that: (1) Allan really was working on the Uphill Property where the trees and vegetation were removed; and (2) Defendant Peace is not at

all a very credible witness. Therefore, the Court finds the testimony of Karen and Jeff to be more credible. Defendant Peace and Allan, together, removed the trees and vegetation from the Uphill Property using the earth moving equipment Allan owned. This is also consistent with the testimony of Mr. Abercrombie and Mr. Cooper that the trees and vegetation appeared to have been removed by earth moving equipment.

Defendant Peace substantially participated in the removal of the trees and vegetation from the Uphill Property.

### Did Defendant Peace Breach a Duty of Care When He Interfered With the Flow of Surface Water?

Defendant Peace breached a duty of care only if his interference with the flow of surface water was unreasonable. *See McGlashan*, 62 Ohio St.2d at 60, 402 N.E.2d 1196. The reasonableness of the interference is determined by balancing the gravity of the harm against the utility of the defendant's conduct. *Id.*; *Paxson*, 152 Ohio App.3d at 203, 787 N.E.2d 59. This determination is governed by the rules set forth in Restatement (Second) of Torts §§ 822–831 (1979). *McGlashan*, 62 Ohio St.2d at 60, 402 N.E.2d 1196.

Section 827 of the Restatement lists five factors relevant to determining the gravity of the harm: (1) the extent of the harm involved; (2) the character of the harm involved; (3) the social value that the law attaches to the type of use or enjoyment invaded; (4) the suitability of the particular use or enjoyment invaded to the character of the locality; and (5) the burden on the person harmed of avoiding the harm. Restatement (Second) of Torts § 827 (1979). Section 828 of the Restatement lists three factors relevant to determining the utility of the conduct: (1) the social value that the law attaches to the

primary purpose of the conduct; (2) the suitability of the conduct to the character of the locality; and (3) the impracticability of preventing or avoiding the invasion. Restatement (Second) of Torts § 828 (1979). These factors, balanced together, establish that Defendant Peace's interference was unreasonable.

The extent of the harm involved is substantial. In the words of Mr. Cooper, water "decimated" the Vande Ryt Property. Mr. Abercrombie said that water "tore" and "significantly damaged" the Vande Ryt Property. According to Karen and Jeff, the Vande Ryt Property looks as if a bomb exploded. Mr. Cooper and Mr. Abercrombie suggested they had never seen this magnitude of surface water damage in their experience with runoff issues.

Defendant Peace's conduct was not suitable to the character of the locality. Mr. Abercrombie believed the county would require a permit before commencing work on such a steep slope. His opinion was confirmed when the office of soil and water conservation visited the site and advised Karen that the work on the Uphill Property "was definitely something that should not be done." Mr. Cooper concurred: "That's the first thing you should not do on a hillside is take the trees and kill the grass."

It was not impracticable for Defendant Peace to prevent or avoid the invasion. Defendant Peace and Allan possessed the equipment and knowledge needed to route water to the street by use of drains and underground pipes. They testified that they added at least two such drains to the Peace Property. According to Mr. Cooper, the installation of a drain tile along the rear property line of the Vande Ryt Property would protect the property from future water damage. The record suggests no reason why Defendant Peace could not have done the same for the Peace Property, where it borders the Vande Ryt Property and the Uphill Property, and moot the need for the embankment, the swale, and the stripping of trees and vegetation.

Consequently, the gravity of the harm outweighs the utility of the conduct. Therefore, Defendant Peace breached a duty of care owed to the Vande Ryts when he diverted the flow of surface water onto the Vande Ryt Property.

### DEFENDANT PEACE IS LIABLE TO THE PLAINTIFFS UNDER STATE LAW

The Court began by asking whether a debt existed. The answer is yes. Defendant Peace breached a duty of care, proximately causing injury to the Vande Ryts, by unreasonably interfering with the flow of surface water.

### IS THE DEBT NONDISCHARGEABLE UNDER 11 U.S.C. § 523(A)(6)?

 Debts for "willful and malicious injury" are nondischargeable under § 523(a)(6). A debt is discharged unless both willfulness and maliciousness are established. *In re Markowitz*, 190 F.3d 455, 463 (6th Cir.1999); *see also* Bloomberg Law: Bankruptcy Treatise, pt. II, ch. 63, at III, (D. Michael Lynn et al. eds., 2015).

1. Defendant Peace Acted Willfully

 Willfulness requires proof that the actor intended to cause the injury or believed that the consequences of the act were substantially certain to result. *Markowitz*, 190 F.3d at 464. Defendant Peace knew that the damage to the Vande Ryt Property was substantially certain to result from his actions. He testified that he was on the Peace Property helping Allan from the time that Allan purchased the property. He was well aware of the poor condition of the property at that time.

Q: [E]verything you did and your father did took a house that was, as

your father said, in bad shape and, as Mrs. Vande Ryt testified, was in condemnable condition, made that house a good place for you to raise your children, correct?

A: Yes.

Therefore, it was substantially certain that diverting the same water that ruined the Peace Property would ruin the Vande Ryt Property. As everyone would expect, Defendant Peace's diversion of the surface water flipped the condition of the two properties. As soon as Defendant Peace waterproofed the Peace Property, according to Karen, the Peace Property started growing healthy grass and the Vande Ryt Property turned to mud.

2. Defendant Peace Acted Maliciously

 Maliciousness requires an act done "in conscious disregard of one's duties or without just cause or excuse." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986). As discussed above, Defendant Peace's actions breached a duty of care. Defendant Peace consciously disregarded this duty. After the county office of soil and water conservation sent someone to view the activities on the Uphill Property, Defendant Peace continued those activities under the cover of darkness. He knew his actions were improper and proceeded in conscious disregard of the same. Moreover, the record suggests no just cause or excuse for his actions. Nor has Defendant Peace offered an excuse.

Because the debt constitutes a willful and malicious injury, it is nondischargeable under § 523(a)(6).

*TREBLE DAMAGES FOR DESTRUCTION OF TREES*

 As previously mentioned, Mr. Cooper testified that it would cost $30,000 to restore the Vande Ryt Property. However, the Vande Ryts seek treble damages for the destruction of trees pursuant to

Ohio Rev.Code § 901.51, which provides in relevant part:

No person ... shall recklessly ... destroy ... or otherwise injure a ... tree ... on the land of another[.] ... [W]hoever violates this section is liable in treble damages for the injury caused.

Treble damages arising from § 901.51 are recoverable as part of a common law action in a civil proceeding. *See Wooten v. Knisley*, 79 Ohio St.3d 282, 289, 680 N.E.2d 1245 (1997). If recoverable in this action, the treble damages would be nondischargeable. *See In re Abbo*, 168 F.3d 930, 931 (6th Cir.1999)(punitive damages arising from the same conduct addressed by the underlying judgment are nondischargeable under § 523(a)(6)); *In re Trantham*, 304 B.R. 298, 309 (6th Cir. BAP 2004)(treble damages nondischargeable under § 523(a)(6)).

 According to Ohio Rev.Code § 2901.22(C):

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.

This definition of the term "recklessly" applies to Ohio Rev.Code § 901.51. *Wooten*, 79 Ohio St.3d at 289, 680 N.E.2d 1245.

1. Defendant Peace Acted Recklessly

 The Court has already concluded that Defendant Peace knew that the damage to the Vande Ryt Property was substantially certain to result from his actions. If he knew that the damage was substantially certain, he certainly disregarded a substantial and unjustifiable risk with heedless indifference to the consequences. This finding is further supported by the Court's prior finding that Defendant Peace

consciously disregarded his duties to the Vande Ryts without just cause or excuse.

### 2. Tree Damages

According to Karen, the Vande Ryt Property lost approximately twenty-two trees. However, the only quantification of tree damages came from Mr. Cooper. He testified of the need to remove and replace two pines, at a cost of $5,000 to $7,000 per tree, and eleven or twelve deciduous trees, at a cost of $1,000 to $1,200 per tree. Applying the lower end of all of Mr. Cooper's numbers, the record supports a finding of tree damages of at least $21,000.[7] Without more specific proof, the Court will not make a finding of tree damages greater than $21,000.[8]

Pursuant to Ohio Rev.Code § 901.51, the Vande Ryts are entitled to treble damages of $63,000 for the destruction of the trees.

### THE VANDE RYTS' NON-TREE DAMAGES

The Vande Ryts' non-tree damages are easily determined by subtracting the actual tree damages ($21,000) from the total

---

7. Two pine trees × $5,000 per tree = $10,000. Eleven deciduous trees × $1,000 per tree = $11,000.

8. The Plaintiffs bear the burden of proof. If the tree damages were greater, the Plaintiffs

---

cost to remediate the Vande Ryt Property ($30,000). Consequently, the non-tree damages are $9,000.

### TOTAL DAMAGES

The Vande Ryts' total damages are the sum of the trebled tree damages, $63,000, and the non-tree damages, $9,000. Therefore, the Vande Ryts' total damages are $72,000.

### CONCLUSION

For the foregoing reasons, the Court concludes that Defendant Peace willfully and maliciously injured the Vande Ryts' interests in the Vande Ryt Property. The Vande Ryts sustained damages in the amount of $72,000. Pursuant to 11 U.S.C. § 523(a)(6), the Vande Ryts are entitled to a nondischargeable judgment against Defendant Peace for $72,000. The Court will enter a judgment to this effect.

**IT IS SO ORDERED.**

### Attachment

### *Defendant's Exhibit T*

should have elicited more specific testimony from Mr. Cooper on the exact number of trees and the exact cost to replace each tree.

Hamilton County Engineer's Office
Theodore B. Hubbard, P.E.-P.S. County Engineer
www.hamilton-co.org/engineer

0 50 100 200 Feet

2011 CONTOURS

DEF
EXHIBIT T

*Plaintiffs' Exhibit 2*

*Plaintiffs' Exhibit 24*

*Plaintiffs' Exhibit 27A*

*Plaintiffs' Exhibit 18*

*Plaintiffs' Exhibit 16*

*Plaintiffs' Exhibit 39*

http://cagisonline.hamilton-co.org/cagisonline/index.html

3 9