REITH et al., Appellants,

v.

McGILL SMITH PUNSHON, INC. et al., Appellees.

[Cite as *Reith v. McGill Smith Punshon, Inc.*, 163 Ohio App.3d 709, 2005-Ohio-4852.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040760.

Decided Sept. 16, 2005.

---

710

The Perez Law Firm Co., L.P.A., and Robert Armand Perez Sr., for appellants.

Freund, Freeze & Arnold, L.P.A., and John J. Garvey III, for appellee Parrot & Strawser Properties, Inc.

Porter, Wright, Morris & Arthur, L.L.P., and Brian Buzby, for appellee McGill Smith Punshon, Inc.

---

MARK P. PAINTER, Judge.

{¶ 1} Plaintiffs-appellants Leonard and Vida Reith experienced extensive flooding of their driveway and house from 1993 until 2003. The Reiths believed that the flooding was caused by the construction in the early 1990s of the Chatham Woods subdivision on the farmland across the street from their house. The Reiths sued defendant-appellee Parrott & Strawser Properties, Inc., the developer of the subdivision, and defendant-appellee McGill Smith Punshon, Inc., the engineering company that had designed the water-drainage system for the subdivision.

{¶ 2} The trial court granted McGill's motion for summary judgment based on the statute of limitations. The trial court denied the Reiths' motion for partial summary judgment. A jury trial was then held to determine whether Parrott had been negligent when it developed the subdivision. The jury found in favor of Parrott, concluding that there had been no negligence.

{¶ 3} The Reiths now appeal with three assignments of error, arguing that the trial court erred when it granted summary judgment to McGill, and when it denied their motion for partial summary judgment. While we sympathize with

the Reiths' plight, we must apply the law, in this case the statute of limitations. We hold that the trial court was correct in each of its rulings, and we affirm.

## I.   The Water Comes—But from Where?

{¶ 4} The Reiths moved into their house on Rich Road in 1986. At that time, the property across the street had a farmhouse on it surrounded by undeveloped farmland. The Chatham Woods subdivision was built in two stages, beginning in the late 1980s. The first stage, a Homerama development, was completed in the early 1990s. The second stage was completed in 1993 or 1994.

{¶ 5} The Reiths experienced no water problems until the end of 1993. Leonard Reith testified in his deposition that, beginning in late 1993, water would gather on the driveway after it rained. He would need to pump the water off the driveway, and he called the flooding "disconcerting."

{¶ 6} The Reiths repeatedly augered a drain pipe on their property, believing that it was clogged, but the flooding continued. In addition to the flooding of the driveway and sometimes minor flooding in the basement each time it rained heavily, the Reiths' yard gradually developed a sinkhole. Mr. Reith testified that they were not sure why the flooding had occurred, but that they did know that the water was coming from a catch basin on the opposite side of the street that was installed when Chatham Woods was constructed.

{¶ 7} The Reiths eventually contacted the Hamilton County Engineer's office in 1996 or 1997. Bill Hill, a county engineer, came out to the Reiths' house and inspected the sinkhole. Hill told the Reiths that a pipe connecting their driveway drain to a pipe running underneath their yard had been breached. Hill also said that because the breached connection was under the Reiths' private property, it was the Reiths' responsibility, not the county's, to fix it.

{¶ 8} The Reiths decided that they could not afford the estimated $60,000 to excavate their yard and to have the pipes fixed. So for the next several years, they continued pumping water from their driveway each time that it rained. The Reiths bought ever larger pumps, eventually, in 2000, purchasing an industrial-strength pump.

{¶ 9} In April or May 2001, the Reiths finally hired a contractor to excavate their yard and to install a catch basin at the site of the sinkhole. The work was scheduled to be done in late July.

{¶ 10} But before any work was done, on July 17, 2001, a massive rainstorm flooded the Reiths' driveway and house. The Reiths estimated that their basement had seven feet of water and their family room, a half-story up from the basement, had about a foot and a half of water. Mr. Reith testified that a gigantic wall of water had poured over Rich Road onto his property. Reith

claimed that he had an "epiphany" that night and, for the first time, realized that all the water was coming from Chatham Woods.

{¶ 11} The next morning, knowing that Parrott & Strawser was the developer of Chatham Woods, Vida Reith called Neal Strawser and asked for the name of Parrott & Strawser's insurance company. Strawser declined to divulge the information.

{¶ 12} In August 2001, the contractor hired to excavate the yard and to install the catch basin came to the Reiths' property. At that point, it was discovered that, about eight feet underground, at the site of the sinkhole, a 24–inch pipe dead-ended. Unconnected to the 24–inch pipe were two 10–inch pipes, which then ran under the rest of the Reiths' property, eventually surfacing in a neighbor's yard. Because two 10–inch pipes can carry only about 40 percent of the flow of a 24–inch pipe, trouble followed.

{¶ 13} The pipes were not connected and appeared never to have been connected, so the contractor could not complete his work. The Reiths contacted the Hamilton County Engineer's office and the Hamilton County Public Works Department. Each office sent a representative to the Reiths' house, both of whom told the Reiths that it was not the county's problem to fix, but the Reiths', because it was on private property.

{¶ 14} Soon after, another rainstorm again flooded the Reiths' house. The Reiths then invested in 80–pound sandbags and barricaded their garage door. Though it required the Reiths to give up use of their garage, the sandbags effectively prevented any more flooding for several years. Meanwhile, the Reiths began litigation. After initially suing individual homeowners in the Chatham Woods subdivision, the Reiths eventually named McGill and Parrott as defendants in their suit in April 2003.

{¶ 15} Steve Mary, the Public Works representative who had visited the Reiths in 2001 after the first flood, told them that a possible solution for the problem would occur when the county followed through on a planned widening of Rich Road. In 2003, the county widened Rich Road. During the widening process, the pipe under the road from the subdivision to the Reiths' property was abandoned, and water from the subdivision was rerouted along Rich Road. The Reiths have not experienced any more flooding since the piping was rerouted.

{¶ 16} Richard Carr, a civil engineer, testified in a deposition for the Reiths. Carr stated that the Reiths' problem was caused by too much water flowing through the pipes under their yard. He also stated that had the 24–inch pipe continued under the entire length of the Reiths' yard, the system could probably have handled all the water. In fact, when Carr gave an estimate to the Reiths to

eliminate the flooding, he suggested extending the 24–inch pipe under the entire length of their yard.

{¶ 17} But in his deposition, Carr insisted that the cause of the flooding was not the ill-fitting pipes—the 24–inch pipe ending in gravel with two 10–inch pipes nearby—but too much water passing under the Reiths' yard. Carr testified that the water-drainage system for Chatham Woods was designed properly, in that all the water from the subdivision was collected and taken to Rich Road in a 24–inch pipe. But he thought that the designers of the system and the developers of the subdivision neglected to anticipate where all the water leaving the subdivision would eventually end up.

{¶ 18} Carr testified that it was McGill's and Parrott's duty to ascertain that there was adequate outfall for the water leaving the subdivision. He claimed that if they had checked during construction to determine where all the water leaving the subdivision would eventually surface, they would have discovered that the outfall from the 24–inch pipe was two 10–inch pipes that eventually surfaced about 160 feet away from the Reiths' property in a neighbor's yard. In sum, Carr stated, "[T]hey designed a beautiful system to convey the water to a certain point but then they failed to confirm that * * * there was a proper discharge from that point."

{¶ 19} James Watson, an engineer with McGill, did not work on the Chatham Woods project, but reviewed all the survey and engineering records retained by the company. He testified that the water-drainage design was consistent with the standards of the Hamilton County Public Works Department. He claimed that the Reiths' problem was caused by blockage of the pipes that ran through their yard, which was a private system.

{¶ 20} Watson testified that an engineer did not have to determine the outfall. He said that the system designed by McGill drained the water to the existing watershed, which was the standard practice at the time. He testified that the design was reasonable because the surface water from 7.9 acres was directed towards the same 24–inch pipe that it had been directed to before the construction. Watson agreed that an engineer had an obligation to respect the limits of the watershed, but he insisted that the same amount of surface water had been directed into the existing 24–inch pipe.

{¶ 21} Watson also testified that draining the water to the developed watershed was the only feasible design at the time. When the county widened Rich Road in 2003, it changed the water drainage from Chatham Woods so that the water ran along Rich Road, rather than across the road onto the Reiths' property. Watson testified that this was not a reasonable design for McGill to have used because it was more involved, and because there was simply no reason at the time not to use the same 24–inch pipe that had already drained the area.

## II. Surface Water or Sewer Water

{¶ 22} The trial court granted McGill's motion for summary judgment, ruling that the four-year statute of limitations[1] barred the Reiths' claims. In their first assignment of error, the Reiths argue that the summary judgment was granted in error.

{¶ 23} We review a grant of summary judgment de novo.[2] McGill was entitled to prevail on its summary-judgment motion only if (1) there was no genuine issue of material fact, (2) it was entitled to judgment as a matter of law, and (3) it appeared that reasonable minds could come to but one conclusion when viewing the evidence in favor of the party opposing the motion, and that conclusion was adverse to the party opposing the motion.[3]

{¶ 24} Before we discuss the statute of limitations, we must address the Reiths' argument that there is a legal distinction between storm water when it is above the ground and storm water when it is channeled through underground pipes. The Reiths contend that once the surface water enters a pipe underground, it becomes sewer water. That is simply not correct.

{¶ 25} In *Crawford v. Rambo*, in 1886, the Ohio Supreme Court defined surface water as "that which is diffused over the surface of the ground, derived from falling rains and melting snows, and continues to be such until it reaches some well defined channel in which it is accustomed to, and does flow with other waters, whether derived from the surface or springs; and it then becomes the running water of a stream, and ceases to be surface water."[4]

{¶ 26} In *Mays v. Moran*, the Fourth Appellate District determined that water accumulating on the plaintiffs' property was surface water because it resulted from rainfall and drained by flowing across their property and eventually into a ditch.[5] In *Emminger v. Bergman*, the Second Appellate District determined that water created by rain and snow that was collected and delivered to the defendant's property through a 24-inch pipe was properly characterized as surface water.[6] And in *Aeh v. Madison Twp. Trustees*, where the defendants constructed

---

1. R.C. 2305.09.

2. See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243.

3. See *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

4. *Crawford v. Rambo* (1886), 44 Ohio St. 279, 282, 7 N.E. 429.

5. See *Mays v. Moran* (Mar. 18, 1999), 4th Dist. Nos. 97CA2385 and 97CA2386, 1999 WL 181400.

6. See *Emminger v. Bergman* (Dec. 29, 1982), 2nd Dist. No. CA 7772, 1982 WL 3901.

a culvert under a driveway that diverted rainwater onto the plaintiff's property, both parties and the court agreed without argument that the channeled underground water was surface water.[7]

{¶ 27} Consequently, we conclude that, in this case, the surface rain water that was temporarily channeled underground through pipes remained surface water until it reached an endpoint where it mixed with "other waters." That is, it remained surface water while piped under the Reiths' property. It did not change character until it emptied from the two 10-inch pipes into a ditch in a neighbor's yard and flowed into a creek that eventually emptied into the Little Miami River.

{¶ 28} The Reiths' attempt to define the storm water in a pipe as sewer water confuses a storm-water system and a sewage system. During Watson's deposition, the Reiths' own counsel clarified the point: "[W]e're going to concentrate today basically on the storm water system and not the sewage system. Is that your understanding? These are separate and distinct things." Watson replied, "Sure." The Reiths' counsel continued, "Unfortunately, some people don't understand the separate and distinct things and it creates problems; does it not?" Watson acknowledged, "It does."

{¶ 29} Despite this, in their appellate brief, the Reiths cite the statutory definitions of sewage and waste water, and argue that surface water must become sewage if it passes underground. Sewage is defined as any substance containing excrement, while waste water means any storm water containing sewage or other pollutants.[8]

{¶ 30} The difference between storm water and sewage lies in what the water contains, not in whether it is above or below ground. Thus, we are not persuaded that there is a legal distinction between surface water that is above the ground and surface water that is temporarily channeled through underground pipes.

{¶ 31} Finally, the Reiths attempt to distinguish surface water above and below the ground by claiming that McGill's expert, Watson, made the distinction. But this is not so. Watson was asked whether water in the underground pipes was surface water, and he replied, "Sure it is." When opposing counsel pointed out that the surface water would no longer actually be on the surface, Watson acknowledged, "Surface water collected by a pipe system, okay."

{¶ 32} Based on Watson's dubious "admission" that the water's character changed once it entered a drainage system underground, the Reiths argue that

---

7. See *Aeh v. Madison Twp. Trustees,* 4th Dist. No. 03CA2885, 2004-Ohio-2181, 2004 WL 912649.

8. See R.C. 6119.011(I) and (K).

the flooding that began in late 1993, which routinely entered their basement and caused a sinkhole in their yard, was a distinct injury separate from the extensive flooding they experienced in 2001.

{¶ 33} There is simply no legal or logical reason to make such a distinction, other than to help the Reiths avoid the statute of limitations barring their claims. We conclude that the distinction the Reiths attempt to make in this case between the earlier flooding and the later flooding, upon which much of their case rests, amounts to no distinction at all. The later flooding was more severe, but the undisputed facts indicate that all the flooding was caused by the same surface-water runoff.

### III. Statute of Limitations

{¶ 34} We now turn to the statute-of-limitations issue. Under R.C. 2305.09(A), there is a four-year statute of limitations for all trespass actions upon real property. Under R.C. 2305.09(D), the four-year limit applies for an injury to rights not arising from a contract. Therefore, the Reiths' claims for negligence and trespass were governed by the four-year statute of limitations.

{¶ 35} The Reiths, relying on their distinction between two separate types of flooding, contend that only the surface flooding was governed by the four-year statute of limitations. But R.C. 2305.09 refers to "trespassing under ground." [9] This indicates that the four-year limit is meant to apply to all trespass claims upon real property, whether involving surface water or underground water. In addition, in *Harris v. Liston*, the Ohio Supreme Court held that the four-year limit of R.C. 2305.09(D) applies when a party seeks recovery for injury or damage to real property.[10]

{¶ 36} In *Harris*, the court also held that the four-year statute of limitations begins to run when damage to the property is "first discovered, or through the exercise of reasonable diligence it should have been discovered." [11] Again relying on the false distinction between flooding caused by water coming over the top of the ground and flooding caused by pipes under the ground, the Reiths assert that because the "surface water flooding did not occur until July 17, 2001," the cause of their damage was not discovered until 2001. Under this view, the statute of limitations did not begin running until 2001, and their claims against McGill were timely filed.

---

9. R.C. 2305.09(E).

10. *Harris v. Liston* (1999), 86 Ohio St.3d 203, 207, 714 N.E.2d 377.

11. Id.

{¶ 37} This, again, is a flawed argument. The undisputed facts indicate that the inadequate piping on the Reiths' private property led to water flooding their driveway, yard, and house. Sometimes the water was underground. Sometimes it was above the ground. But it was the same surface-water runoff. More importantly for statute-of-limitations purposes, the Reiths always suspected that the cause of their problems was the building of the Chatham Woods subdivision.

{¶ 38} The Reiths began to experience serious flooding of their property in 1993 and 1994. Leonard Reith testified that, at that time, water would gather on the driveway after it rained, and that there would be minor flooding in their basement. Vida Reith agreed in her deposition that they first experienced flooding in 1993 or 1994, after Chatham Woods was completed.

{¶ 39} Leonard Reith's testimony revealed that there was a direct and observable correlation between the construction of Chatham Woods and the Reiths' water problems. Reith testified, "The more homes that were built, that is when I started experiencing the water problems, * * * [and] as that was being developed, more and more of that development was causing more of a problem. As it got developed, it was almost exponentially that the water would be more and more."

{¶ 40} And later, Reith stated simply, "I lived there predevelopment. I lived there post-development. My feet were dry predevelopment. My whole body was wet post-development." He reiterated, "It was continually getting worse and worse as the development was growing."

{¶ 41} Reith testified that "a little bit later than '93–'94," the sinkhole in their yard began forming. He did not realize what it was at first and would repeatedly throw dirt into it. But the hole continued to get wider until he had to take action to ensure that people would not fall into it. By 1996 or 1997, he contacted Hamilton County about it.

{¶ 42} The county engineer, Bill Hill, told the Reiths that the sinkhole was caused by a disconnect between pipes under their property. They were told, more than four years before their suit was filed, that it was their responsibility to determine specifically what the problem was and to fix it. When the Reiths finally followed Hill's advice, at least four years later, they discovered the inadequate outfall-pipe tie-in between the 24–inch pipe and the two 10–inch pipes.

{¶ 43} We conclude, as a matter of law, on these undisputed facts that the Reiths knew or should have known that their property was being damaged by water flow associated with the Chatham Woods development at least four years before their lawsuit against McGill. Therefore, the Reiths' claim against McGill was barred by the statute of limitations.

{¶ 44} The Reiths next correctly cite the proposition that negligence is not complete until there has been an invasion of a legally protected interest of the plaintiff, that is, until there is an occurrence of harm.[12] Keeping with the false distinction between surface flooding and underground flooding, the Reiths argue that there was no harm from surface water until 2001.

{¶ 45} But, again, the undisputed facts indicate that the Reiths experienced harm from McGill's allegedly negligent design beginning in late 1993. This was ten years before the Reiths sued McGill. While the "surface flooding" in July 2001 was more catastrophic than the earlier flooding, it was undoubtedly caused by the same problem with the pipes under the Reiths' property.

{¶ 46} We agree with the trial court's assessment: "Injury to the Reiths' property manifested itself and was discovered no later than 1994 under circumstances that any reasonable finder of fact would determine warranted investigation into potential causes related to the Chatham Woods development."

{¶ 47} We hold that the Reiths' claim against McGill was time-barred and that the trial court properly granted summary judgment for McGill. Therefore, we overrule the Reiths' first assignment of error.

### *IV. Continuing Trespass*

{¶ 48} In their second assignment of error, the Reiths argue that because the water causing the flooding on their property was a continuing trespass, the trial court erred when it used the four-year statute of limitations to grant McGill's motion for summary judgment.

{¶ 49} In *Frisch v. Monfort Supply Co.*, we clarified the difference between a permanent and a continuing trespass.[13] A permanent trespass occurs when the defendant's tortious act has been fully accomplished, but injury to the plaintiff's estate from that act persists in the absence of further conduct by the defendant.[14] In contrast, a continuing trespass results when the defendant's tortious activity is ongoing, perpetually creating fresh violations of the plaintiff's property rights.[15]

---

**12.** See *Kunz v. Buckeye Union Ins. Co.* (1982), 1 Ohio St.3d 79, 81–82, 1 OBR 117, 437 N.E.2d 1194.

**13.** See *Frisch v. Monfort Supply Co.* (Nov. 21, 1997), 1st Dist. No. C–960522, 1997 WL 722796.

**14.** Id.

**15.** Id.

{¶ 50} A claim for a continuing trespass may be brought at any time until the claim has ripened into a presumptive right by adverse possession, which takes 21 years.[16] But a claim for a permanent trespass must be brought within the four-year statute of limitations of R.C. 2305.09(D).[17] In this case, the allegedly tortious act by McGill was the design of a drainage system that did not account for the eventual outfall of surface water. It is undisputed that McGill's design of the system, including even the installation of the system, was completed by 1994, at the latest. After that, McGill had nothing to do with Chatham Woods.

{¶ 51} With McGill's allegedly tortious act completed, any ongoing injury to the Reiths' property would have had to be considered a permanent trespass. Under these circumstances, the Reiths were required to bring their trespass claim against McGill within four years of McGill's tortious act. As we have already discussed, the Reiths failed to timely file their claim within the four years, and, consequently, their trespass claim was barred by the statute of limitations. Therefore, we overrule the Reiths' second assignment of error.

### V. Reiths Not Entitled to Summary Judgment

{¶ 52} In their third and final assignment of error, the Reiths argue that the trial court erred when it did not grant their motion for summary judgment against both McGill and Parrott on the issue of trespass.

{¶ 53} We have already determined that the Reiths' trespass claim against McGill was time-barred and that McGill was properly granted summary judgment. Therefore, as a matter of simple logic, the Reiths could not be entitled to summary judgment on their trespass claim against McGill. In support of their view, the Reiths again insist that there was a continuing trespass. But we have already addressed and dismissed that argument.

{¶ 54} As for Parrott, the matter is more complicated. The trial court denied not only the Reiths' motion for summary judgment, but also Parrott's summary-judgment motion.

{¶ 55} The trial court determined, as we have, that McGill's design and control responsibilities for the Chatham Woods drainage system ended no later than 1994. Once McGill's allegedly tortious act was completed, the Reiths had no claim for a continuing trespass against McGill.

---

16. See *Haas v. Sunset Ramblers Motorcycle Club, Inc.* (1999), 132 Ohio App.3d 875, 878, 726 N.E.2d 612; see, also, *Wood v. Am. Aggregates Corp.* (1990), 67 Ohio App.3d 41, 44, 585 N.E.2d 970.

17. See *Weir v. E. Ohio Gas Co.*, 7th Dist. No. 01 CA 207, 2003-Ohio-1229, 2003 WL 1194080, at ¶ 17; see, also, *Frisch*, supra, 1st Dist. No. C–960522, and *Haas*, supra, 132 Ohio App.3d 875, 726 N.E.2d 612.

{¶ 56} But the trial court concluded that a similar definitive date could not be established for Parrott's involvement. The court determined that whether Parrott was continuously involved with Chatham Woods was unclear from the evidence before it, meaning that a question of fact remained for a jury to determine.

{¶ 57} Our review of the record convinces us that, at the summary-judgment stage, a question of fact remained concerning how much control Parrott retained over Chatham Woods and whether it retained responsibility for the drainage system. It is possible that Parrott did not retain any control over the system and was completely removed from responsibility for it, similar to McGill, thus making the trespass a permanent one subject to the four-year statute of limitations. It is also possible, though, that Parrott retained some control over the system, and that the trespass could be found to be a continuing trespass not barred by the four-year statute of limitations. But the Reiths had the obligation to prove the extent of Parrott's involvement.

{¶ 58} We are also not convinced that reasonable minds, viewing the evidence in favor of Parrott, could come to but one conclusion, that being that Parrott trespassed on the Reiths' property. Reasonable minds could very well conclude that Parrott did not commit a trespass.

{¶ 59} Therefore, we hold, as the trial court did, that it was not appropriate to grant summary judgment against Parrott on the issue of trespass, and we overrule the Reiths' third assignment of error.

{¶ 60} Parrott further argues that, under *Continental Ins. Co. v. Whittington*,[18] the trial court's denial of the Reiths' motion for summary judgment was mooted or rendered harmless because there was a subsequent trial. But without a full record before us of what happened at that trial, we cannot rely on *Continental* and simply hold that the trial court's denial of the Reiths' summary-judgment motion was proper.

{¶ 61} Having overruled all three of the Reiths' assignments of error, we affirm the trial court's judgment.

Judgment affirmed.

HILDEBRANDT, P.J., and HENDON, J., concur.

---

18. See *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 642 N.E.2d 615.