[Cite as *North Coast Premier Soccer, L.L.C. v. Ohio Dept. of Transp.*, 2012-Ohio-5296.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

NORTH COAST PREMIER SOCCER, LLC

    Plaintiff

    v.

OHIO DEPARTMENT OF TRANSPORTATION, et al.

    Defendants

Case No. 2009-07091

Judge Joseph T. Clark
Magistrate Lewis F. Pettigrew

DECISION OF THE MAGISTRATE

{¶ 1} Plaintiff brought this action alleging negligence. The issues of liability and damages were not bifurcated and the case proceeded to trial on both issues.

{¶ 2} Plaintiff, North Coast Premier Soccer (NCPS), owns and maintains a large soccer complex situated on property both north and west of the interchange of U.S. Route 224 (US 224), Interstate 71 (I-71), and Interstate 76 (I-76) in Seville, Ohio.[1] NCPS's property, which it purchased from Medina Sod Farms, consists of a front parcel, back parcel, and an indoor facility. At issue in this case is a flood that occurred in August 2007, on NCPS's 38-acre front parcel. The front parcel is divided by a ditch (middle ditch) that empties into a second ditch to the north of the property (north ditch). Another ditch forms a western boundary (west ditch). It is not disputed that NCPS's property sits in a designated flood plain and routinely floods.

{¶ 3} Prior to the commencement of this action and prior to the flooding at issue in this case, the Ohio Department of Transportation (ODOT) commenced an eminent domain proceeding against NCPS in the Medina County Court of Common Pleas

---

[1]US 224 and I-76 are the same road as they pass NCPS's property.

captioned *Gordon Proctor, Director of Ohio Department of Transportation v. North Coast Premier Soccer, Ltd., et al.*, Case No. 06-CIV-0108. As a part of the proceeding, ODOT acquired property from NCPS for a construction and improvement project.[2]

{¶ 4} As a part of the improvement project, ODOT was required to obtain a permit from the Ohio Environmental Protection Agency for a national pollutant discharge elimination system (NPDES). Such a permit allows a contractor to discharge sediment-laden storm water onto the surrounding property so long as the contractor has in place a storm water pollution prevention plan (SWPPP) with appropriate temporary sediment erosion controls (TSEC) utilizing best management practices (BMPs). BMPs are controls that regulate the release of storm water during construction to ensure compliance with the NPDES permit. Supplemental specification 832 requires the contractor to perform its operations in accordance with the permit.[3]

{¶ 5} The improvement project required the construction of a new 30-foot-high earthen embankment-style ramp (ramp E-S) for westbound traffic from I-76 to southbound I-71. At the base of the embankment, ODOT installed two temporary culverts designed to allow draining water to flow through the embankment and empty into the middle ditch on NCPS's property.

{¶ 6} Project engineer, Luke Wysocki, explained that the method of constructing the earthen damn consists of hauling thousands of tons of earthen fill to the site and then laying and compacting the fill in eight-inch increments per day. ODOT also installed both an inclinometer and a piezometer to measure the water pressure in the earth.

{¶ 7} On or about July 11, 2007, Wysocki performed an inspection of the construction project and identified several "deficiencies and concerns." (Plaintiff's

---

[2]On November 29, 2011, this court ruled that NCPS had settled and released all claims with respect to the property identified in the Judgment Entry in the eminent domain proceeding.
[3]ODOT engineer Ron Trivisonno explained that supplemental specification 833 was merged into the body of supplemental specification 832 eliminating the need for two separate specifications.

Exhibit 8.) On July 18, 2007, Wysocki placed the Ruhlin Company on "notice that deficiencies exist throughout the project that will need to be corrected in order to be compliant with Supplemental Specifications 832, 833, and the NPDES Construction Storm Water General Permit." (Plaintiff's Exhibit 8.) Specifically, Wysocki identified a need to install sediment basins, ditch checks, sediment dams, rock channel protection, and perimeter fabric fencing. Wysocki also noticed a large crack in the embankment. (Plaintiff's Exhibits 38 and 39.)

{¶ 8} In early August 2007, Wysocki observed that the piezometers began to read higher than what was allowed by the project specifications and that there was a large depression in the embankment directly above the culverts, all of which led him to believe that one of the temporary culverts had collapsed. (Plaintiff's Exhibit 9.) By August 14, 2007, Wysocki noticed that "two large depressions" had formed over the culvert pipes, which appeared to him to have "completely collapse[d]." (Plaintiff's Exhibit 12.) On August 17, 2007, Wysocki met with several ODOT engineers and determined that the capacity of the culverts was significantly reduced and that there were concerns about storm water management. Although ODOT decided to install a sump pump to reduce ground water and control storm water, Wysocki admitted that ODOT never installed such a pump.

{¶ 9} On August 20, 2007, heavy rains forced a shutdown of the construction site. As a result of both the heavy rains and the failed culverts, water began accumulating on the south side of ramp E-S. The storm water eventually backed up onto I-76, forcing the closure of several lanes of traffic. Wysocki subsequently directed Ruhlin Company to pump the water off of I-76 and into a ditch along I-76 (I-76 ditch). Wysocki testified that the water was pumped into the I-76 ditch, which he believed emptied directly into the west ditch on the west side of NCPS's property. However, Wysocki admitted that he did not confirm that any of the redirected storm water was actually reaching the west ditch and that he was unaware that ODOT was pumping the water against the grade of the property. Wysocki stated that no one from ODOT asked NCPS for permission to

pump water onto its property and that ODOT did not have a permit to discharge water into the west ditch.

{¶ 10} Wysocki testified that pumping stopped either on August 23, 2007, or August 24, 2007. According to Wysocki's daily diary report dated August 22, 2007, pumping was to continue throughout the night and the pumps were to be "hauled off site tomorrow." (Plaintiff's Exhibit 18.)

{¶ 11} NCPS's representative Michael Sweeney testified that part of the 38-acre front parcel routinely floods but that the water usually recedes within a day or a day and a half. According to Sweeney, when the water receded in August 2007, the soccer fields were covered with a thick layer of sediment, clay, and silt. Sweeney explained that a typical flood would have clear water and the fields would be ready for use within days, but that was not the case in this instance.

{¶ 12} Ryan Gregoire, owner of Medina Sod Farms, which sits adjacent to NCPS's front parcel, testified that in a typical flood, the water is fairly clear. According to Gregoire, the water in August 2007 was brown and muddy, and that when the water receded, he noticed a very strong silt line on the vegetation. Gregoire explained that silt and clay are fine particles that clog porous spaces and eliminate drainage. Gregoire asserted that too much silt can kill vegetation because it blocks the plants from receiving light. Sweeney testified that as a result of the flood, much of the 38-acre parcel was unusable for soccer without extensive repairs. Sweeney asserted that because some of the fields were unusable, soccer tournaments and games were either relocated or cancelled and that the business's reputation was harmed. Plaintiff claims damages totaling $400,339.

{¶ 13} Defendants argue that plaintiff's claims are barred by the applicable statute of limitations. Pursuant to R.C. 2743.16(A), "civil actions against the state permitted by sections 2743.01 to 2743.20 of the Revised Code shall be commenced no later than two years after the date of the accrual of the cause of action * * *."

{¶ 14} The evidence establishes that defendants pumped water away from ramp E-S into the I-76 ditch beginning on August 20, 2007 and that such pumping continued throughout the night of August 22, 2007. (Plaintiff's Exhibit 18.) Wysocki testified that pumping continued through August 23 or 24, 2007. Wysocki's daily diary report states that the pumps were removed from the site on August 23, 2007. (Plaintiff's Exhibit 19.) Therefore, the court finds that the alleged tortious activity began on August 20, 2007 and continued through August 23, 2007. Plaintiff filed its claim on August 24, 2009. Inasmuch as Civ.R. 6(A) provides that when computing the time for the applicable statute of limitations, the day of the event "shall not be included," the court finds that plaintiff's claim is not time barred.

{¶ 15} Moreover, even if plaintiff's claim was filed more than two years after the damage occurred, the court finds that the discovery rule applies to plaintiff's claim. Generally, a cause of action accrues at the time the wrongful act is committed. *O'Stricker v. Jim Walter Corp.*, 4 Ohio St.3d 84, 87 (1983). Under the discovery rule, the statute of limitations begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered a possible cause of action. *Id.* at 90. Ohio courts have applied the discovery rule to cases involving latent property damage. *See Laipply v. Bates*, 166 Ohio App.3d 132, 2006-Ohio-1766, ¶17 (7th Dist.); *Dalesandro v. Ohio Dept. of Transp.*, 10th Dist. No. 10AP-241, 2010-Ohio-6177.

{¶ 16} Sweeney testified that he did not realize that this particular flood was unlike any other previous flood until the water receded. In fact, Gregoire testified that after the water receded he noticed a strong silt line on the vegetation, which he asserted is not typical in a normal flood. Therefore, the court finds that plaintiff should have discovered the damage shortly after the pumping had concluded as the water began to recede revealing the silt line on the vegetation. As noted above, defendants ceased pumping on August 23, 2007. Inasmuch as plaintiff filed its complaint on August 24, 2009, the court finds that the statute of limitations does not bar plaintiff's claim. *See* Civ.R. 6(A).

{¶ 17} Trespass is defined as "an interference or invasion of a possessory interest in property." *Abraham v. BP Exploration & Oil, Inc.*, 149 Ohio App.3d 471, 2002-Ohio-4392, ¶14 (10th Dist.). "[I]n order to set forth a prima facie case of trespass to real property, a plaintiff must demonstrate an unauthorized and intentional act, and entry onto the land in possession or control of another." *Id.*

{¶ 18} The water emanating from the discharge pipes is properly defined as "surface water," meaning "'that which is diffused over the surface of the ground, derived from falling rains and melting snows, and continues to be such until it reaches some well defined channel in which it is accustomed to, and does flow with other waters, whether derived from the surface or springs; and it then becomes the running water of a stream, and ceases to be surface water.'" *Reith v. McGill Smith Punshon, Inc.,* 163 Ohio App.3d 709, 2005-Ohio-4852, ¶25 (1st Dist.), quoting *Crawford v. Rambo*, 44 Ohio St. 279, 282 (1886). Such water remains surface water even when collected and channeled through pipes, until it reaches an endpoint where it mixes with "other waters." *Id.* at ¶27.

{¶ 19} The Supreme Court of Ohio has adopted a reasonable use rule for surface water disputes: "In resolving surface water disputes, courts of this state will apply a reasonable-use rule under which a possessor of land is not unqualifiedly privileged to deal with surface water as he pleases, nor absolutely prohibited from interfering with the natural flow of surface waters to the detriment of others. Each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, and the possessor incurs liability only when his harmful interference with the flow of surface water is unreasonable." *McGlashan v. Spade Rockledge Terrace Condo Dev. Corp.*, 62 Ohio St.2d 55 (1980), syllabus.

{¶ 20} "Under the reasonable-use rule, unless the defendant's conduct is unlawful or subject to strict liability, the defendant's liability for interference with surface water

flow is controlled by principles of common law negligence, regardless of whether the plaintiff's cause of action sounds in nuisance or trespass." *Franklin Cty. Dist. Bd. of Health v. Paxson*, 152 Ohio App.3d 193, 2003-Ohio-1331, ¶30 (10th Dist.).  In order to prevail under a theory of negligence, plaintiff must prove by a preponderance of the evidence that defendants owed plaintiff a duty, that defendants' acts or omissions resulted in a breach of that duty, and that the breach proximately caused its injuries. *Armstrong v. Best Buy Co., Inc.*, 99 Ohio St.3d 79, 2003-Ohio-2573, ¶8, citing *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984).  A breach of duty, under the common law, can be found only if defendants' interference with surface water flow is unreasonable, which is determined, "by balancing the gravity of the harm caused by the interference against the utility of the [defendants'] conduct." *McGlashan, supra,* at 60, adopting 4 Restatement of the Law 2d, Torts, Sections 822-831, at 108-142 (1979).

{¶ 21} There is no question in this case that the NPDES permit sets forth the appropriate standard of care.  In other words, any discharge of surface water onto NCPS's property that is within the scope of the permit is reasonable whereas the discharge of surface water in excess of the scope of the permit is not reasonable and ODOT will be liable to plaintiff for any damage caused thereby.  The evidence establishes that the permit prescribes a flexible standard which means that what is required in terms of SWPPP, TSEC and BMPs depends on the facts and circumstances that exist at any given time.  The permit also allows the holder a reasonable amount of time to adjust BMPs as the facts and circumstances change.

{¶ 22} Plaintiff presented the expert testimony of licensed professional engineer Jack Gaydar, who is a certified erosion, sediment, and storm water inspector.  Gaydar explained that construction sites are the source of contaminates and pollutants that can be harmful to the environment.  Gaydar opined that ODOT did not have the appropriate BMPs in place when it discharged the storm water in August 2007.  According to Gaydar, ODOT violated its permit when it directed its contractor to pump the storm water from the collection area south of ramp E-S to the west ditch inasmuch as ODOT

either knew or should have known that the water would not reach the west ditch and would spill out over NCPS's property. Specifically, Gaydar faulted ODOT for not having knowledge of the grade of the property and for not having a sufficient length of drainage pipes on site to successfully direct the water to the west ditch. According to Gaydar, when the water was discharged from the pipes, it turned to the north and onto plaintiff's property.

{¶ 23} Gaydar explained that the pipes were also discharging water at a high velocity causing significant erosion to the area surrounding the outlet. According to Gaydar, such an area contained a wide variety of construction debris and contaminants, including asphalt millings, that were subsequently washed onto plaintiff's property.

{¶ 24} Gaydar also faulted ODOT both for the condition of the detention basin to the south of ramp E-S and for the positioning of the inlet of the pump within the basin. Specifically, Gaydar criticized ODOT's decision to place the inlet directly against the bank of the collection basin. He explained that in a true detention basin, the sediment and debris will settle to the bottom and sides of the basin; that when the inlet of the pump is laid by the side of the basin, the inlet will suck up the sediment that has settled near the inlet. Gaydar testified that in a true settlement basin, the inlet is placed in the center of the basin several inches below the surface. Gaydar further asserted that the water was not calm, as is the case in a true settlement basin. According to Gaydar, the detention basin contained ripples which inhibits the settling. Gaydar based this opinion on several photos taken by ODOT depicting the detention basin. Accordingly, Gaydar concluded that ODOT did not have a true settlement basin.

{¶ 25} Gaydar observed that the pumps that ODOT used to remove the water from the detention basin were powerful enough to handle solids and he stated that a strainer should have been attached to the pumps at the inlet to prevent excess solids from entering the pipe. Although ODOT witnesses testified that the pumps were not capable of handling solids, Gaydar referenced the manufacturer's specifications, which

state that the pumps are capable of handling up to three-inch aggregate solids. Gaydar asserted that the absence of a strainer on any of the three pumps caused additional sediment and debris to be pumped onto plaintiff's property.

{¶ 26} According to Gaydar, ODOT should have implemented several BMPs to minimize the amount of sediment discharged into the storm water and eventually deposited onto plaintiff's property. Gaydar asserted that ODOT could have reduced the amount of sediment discharged in the storm water by using a settlement treatment tank or straw bales and rock check dams to trap the sediment and reduce the velocity of the water. However, no such BMPs were implemented. Gaydar further asserted that ODOT should have declared an emergency in early August when the collapsed culverts were discovered, excavated the culverts, and allowed open channel water flow. Gaydar estimated that such a course of action could have been completed in a day or a day and a half.

{¶ 27} Gaydar also estimated that 30.2 million gallons of sediment-laden storm water was pumped onto plaintiff's property between August 20 and 23, 2007, and that once the water reached plaintiff's soccer fields, the blades of grass acted like a filter strip, slowing the water and allowing the sediment to drop due to gravity, damaging the grass. In Gaydar's opinion, NCPS soccer fields were damaged as a result of ODOT's decision to pump water onto its property in violation of its NPDES permit, its SWPPP and BMPs.

{¶ 28} Defendants presented the expert testimony of ODOT employee, Ron Trivisonno, who is a certified professional engineer in sediment and erosion control and soil science. Trivisonno was asked by his supervisor Gary Middleton to review Gaydar's report. Trivisonno testified that the amount of sediment and water that discharged onto plaintiff's property had been dramatically reduced because of the collapse of the culverts below ramp E-S. Trivisonno explained that the culverts collected water from a one and a quarter square mile watershed south of the embankment and that when the water collected south of the embankment, it allowed the

particles to fall to the bottom of the basin. Trivisonno asserted that the embankment also reduced the flow of the water that eventually made it to plaintiff's property. According to Trivisonno, such a detention effect allowed sand and silt particles to fall very quickly to the bottom, and that without such a detention basin and embankment, a significantly greater amount of particles would have been deposited onto plaintiff's property.

{¶ 29} Trivisonno testified that defendants' SWPPP and BMPs represented a "good faith" effort of compliance and that ODOT met the standard of care. Trivisonno based his opinion upon ODOT documents detailing conversations between project staff and the contractor regarding modifications to specific BMPs. Trivisonno was unwilling to characterize the deficiencies identified by Wysocki as violations of the NPDES permit.

{¶ 30} Trivisonno explained the NPDES permit requires the SWPPP to be amended and the BMPs to be updated as conditions on the site change. The extent of such amendments is determined by inspections which are required to occur at least weekly and within 24 hours of a half-inch or greater rainfall event. According to Trivisonno, the NPDES permit allows for some flexibility in terms of the timeliness of addressing the changes to the BMPs. Trivisonno explained that when the NPDES permit requires a significant amount of work, such as a detention basin, the contractor is allowed more time to comply with the permit; however, the permit only allows 48 hours for more simple updates to the BMPs to address minor perimeter controls, such as a fixing a silt fence, to comply with the permit. Trivisonno was unaware whether the contractor updated its BMPs or corrected any identified deficiencies prior to the August 2007 flood.

{¶ 31} Trivisonno asserted that the inlet for the pumps was placed in the shallows at the fringe of the detention basin, and at that point, much of the silt would have already settled to the bottom of the basin. Trivisonno stated that only suspended clay particles would have been pumped because the pumps used by ODOT could not

handle solids; however, Trivisonno admitted that he was unaware that the manufacturer's specifications indicated that the pumps were capable of handling three-inch aggregate solids. Trivisonno estimated that ODOT pumped 27,228,000 gallons of water, which includes 2,764 tons of sediment, onto plaintiff's property. Trivisonno stated that such an estimate assumes that the pumps were operating at 80 percent efficiency. Finally, Trivisonno acknowledged that the soccer fields acted as a filter strip collecting the particles prior to reaching the north ditch.

{¶ 32} To the extent that plaintiff argues that ODOT was negligent in either its construction or design of the embankment-style ramp, the court concludes that plaintiff failed to present any competent evidence of such negligence. Indeed, both Wysocki and Trivisonno testified that an embankment-style ramp is the standard specification. Trivisonno stated that even though the embankment-style ramp was constructed on an aquifer, much of Ohio is an aquifer and it does not inhibit the use of such ramps. Moreover, Trivisonno was unable to testify that the failure of the culverts and embankment could have been prevented. Indeed, Trivisonno stated that the culverts were designed to fail at some later point in time and that they were to be replaced by a boxed culvert. Trivisonno stated that it is common to build earthen embankments on weak soils. In short, plaintiff has not presented the court with evidence of ODOT's negligence in the design or construction of the earthen embankment.

{¶ 33} However, based upon the totality of the evidence, the court concludes that defendants owed a duty to plaintiff to comply with the NPDES permit and that defendants breached that duty by failing to employ reasonable BMPs in dealing with the storm water. As a result of defendants' failure to employ appropriate BMPs prior to discharging sediment into storm water, NCPS's fields were damaged. Even Trivisonno admitted that as the conditions of the site change, ODOT is required to update its SWPPP to ensure that it has the appropriate BMPs in place.

{¶ 34} By the middle of July, ODOT noticed cracks above the twin culverts in the embankment ramp and ODOT had identified several "deficiencies" with storm water

management.   Wysocki admitted that ODOT knew of problems with the temporary culvert pipes as early as August 10, 2007, ten days prior to the beginning of the flooding, and that ODOT should have inspected the pipes.  By August 14, 2007, ODOT knew that the temporary pipes had completely collapsed preventing water from continuing through the embankment; however, no changes were made to the BMPs. Furthermore, Wysocki admitted that storm water was not managed correctly in August 2007.

{¶ 35} As a result, the court concludes that ODOT should have updated its SWPPP in early August 2007 to ensure that it had the appropriate BMPs in place and that such a failure unreasonably interfered with the flow of surface water.  The court is convinced by Gaydar's testimony that ODOT did not have the appropriate BMPs in place prior to discharging sediment onto plaintiff's property.  Although the water backup south of the embankment created a detention pond allowing some silt and sediment to settle to the bottom, ODOT discharged the water at a high velocity onto an area containing construction debris and failed to take reasonable steps to minimize erosion or contain any of the contaminants.  Furthermore, the pumps used were capable of handling small clay particles and the inlet of the pump was positioned in such a way to minimize the efficacy of a true detention basin.  As a result, at least 27,228,000 gallons sediment-laden water was discharged onto plaintiff's soccer fields.  Both experts agree that the soccer fields acted as a filter strip, depositing the sediment and cleaning the water prior to reaching the north ditch.

{¶ 36} With respect to damages, plaintiff alleges that it sustained damages in the amount of $126,269 for repairs and restoration, $246,543 in lost net profits, and $27,527 in lost opportunity costs for a total of $400,339.  Defendants argue that plaintiff failed to prove that it sustained any damage.

{¶ 37} A plaintiff bears the burden of proof on damages.  *Henderson v. Spring Run Allotment*, 99 Ohio App.3d 633, 641 (9th Dist. 1994).  "In a tort action, the measure

of damages is normally that amount of money which will compensate and make whole the injured party." *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 184 (1975), citing *Pryor v. Webber*, 23 Ohio St.2d 104 (1970). A plaintiff "should be neither undercompensated nor overcompensated. Ordinarily, the injured party must be able to prove not only that he suffered a particular type of injury, but also the pecuniary value thereof." *Id.* In *Ohio Collieries Co. v. Cocke*, 107 Ohio St. 238, 248 (1923), the Supreme Court of Ohio held that in cases involving real property damage that is susceptible to repair, "the measure of damages is the reasonable cost of restoration * * *." The Tenth District Court of Appeals has explained that "the measure of damages for a repairable injury is the reasonable cost to repair, plus reasonable compensation for the loss of the use of the property between the time of the injury and the restoration." *Case Leasing & Rental, Inc. v. Ohio Dept. of Natural Resources*, 10th Dist. No. 09AP-498, 2009-Ohio-6573, ¶41, citing *Ohio Collieries Co., supra*. "A plaintiff may recover profits lost as a result of a defendant's tortious conduct if such damages may naturally be expected to follow from the wrongful act and if the damages are reasonably ascertainable." *Henry v. Akron*, 27 Ohio App.3d 369, 372 (9th Dist. 1985).

{¶ 38} Sweeney testified that NCPS incurred $126,269 in restoration costs. (See Plaintiff's Exhibit 58 and 59.) Sweeney explained that after the flood, he approached Gregoire for assistance in repairing the property. Sweeney stated that NCPS spent $50,550 to replace clogged drain tile and that NCPS's employees performed the work of replacing the drain tile. Sweeney came up with $50,550 for the cost of repairs after speaking with Gregoire regarding the drain tile. According to Gregoire, it was cheaper to replace 5,055 feet of drain tile rather than search for the clogged portions and clean them out. Gregoire explained that the sediment settled in the pipes clogging the drainage system and that it would cost $10 per foot to replace the effected drain tile. Sweeney admitted, however, that each year NCPS replaces some drain tile and that the flood "exacerbated" the deterioration of the tile. Sweeney further admitted that some of the drain tile that was replaced had been installed in the 1950s. Trivisonno testified that

a single flooding event would not be sufficient to entirely clog drain tile and that it would only clog after repeated floods over an extended period of time.

{¶ 39} Gregoire testified that after the flood, the middle ditch was filled with silt.[4] Sweeney stated the NCPS spent $4,067 to rent an excavator and hire an operator to clean out the ditch. Sweeney stated that NCPS was also required to obtain the necessary permits to clean out the ditches and that the cost of the permits, which he estimated to be a couple thousand dollars, is included in his figure.

{¶ 40} In addition to the middle ditch, Sweeney stated that NCPS cleaned out the north ditch.[5] Sweeney explained that the rental price for an excavator was $6,000, but that NCPS split the expense with Cliff Gregoire, former owner of Medina Sod Farms, and that Cliff did the work for free. Sweeney testified that NCPS was required to use a silt fence and that NCPS spent $1,495 on such a fence. Such a cost is consistent with Gregoire's estimate of $2 per foot at approximately 750 feet.

{¶ 41} Sweeney testified that six fields west of the middle ditch and one field east of the middle ditch needed new turf after the flood. Sweeney sought a proposal from Gregoire to repair the effected fields. Gregoire's proposal contained an estimate of $238,000 for new sod and $48,000 to reseed the effected areas. (Plaintiff's Exhibit 70.) Sweeney explained that NCPS did not have sufficient capital to lay new sod so he decided that he and his employees would reseed the fields themselves. Sweeney explained that the work required tilling the ground, leveling it out, putting in new drainage, and planting new seed. According to Sweeney, such a process requires that the field be unused for at least a year. According to a document prepared by Sweeney, NCPS sustained damages in the amount of $48,057 to "redo" the west fields and $19,100 to "redo" the east field. (See Plaintiff's Exhibit 58.) Gregoire testified that such expenses to repair the damaged fields were indeed "reasonable."

---

[4]Plaintiff's Exhibit 58 refers to a north-south ditch, which the court has identified as the middle ditch.

{¶ 42} Jeffery Firestone, a certified public accountant and certified fraud examiner, testified that NCPS sustained $126,269 in "out-of-pocket" expenses, $246,543 in "lost net profits," and $27,527 in "opportunity costs," for a total of $400,339. Firestone stated that he based his opinion upon his review of financial records from NCPS's Quickbooks accounting system, NCPS's league and tournament schedules, and other information relevant to repairs and maintenance costs.

{¶ 43} Regarding "out-of pocket" expenses, Firestone testified that he simply reviewed the list of costs that the club incurred and incorporated them into his report as exhibits 4, 4A, 4B, and 4C. (Plaintiff's Exhibit 53.) Firestone stated that he prepared exhibit 4, but that exhibits 4A, 4B, and 4C are simply Quickbook reports provided to him by NCPS. Firestone explained that he inquired about the list and confirmed that the costs were related to the repair work on the property.

{¶ 44} The court concludes that plaintiff suffered damages in the form of out-of-pocket expenses in the amount of $62,140. Plaintiff's damage estimates for the replacement of its drain tile and work on its east and west fields were not the actual costs of such work. Indeed, Sweeney testified that NCPS's employees performed the work and that Gregoire only provided estimates for such work. As a result, plaintiff's award of damages for the replacement of drain tile will be adjusted to reflect costs associated with the tile that was in need of repair prior to the flood and the award for the repair of the east and west fields will be adjusted to reflect the savings to NCPS for self performing the work. Accordingly, the court finds that plaintiff's damages for the replacement of its drain tile will be reduced to $20,000 to account for the fact that NCPS replaces drain tile each year; the fact that at least some of the drain tile was original drain tile; and that the 2007 flood only exacerbated the development of clogs in the drain tile. The court finds that plaintiff is entitled to $4,067 to clean out the middle ditch;

---

[5]Plaintiff's Exhibit 58 refers to an east-west ditch, which the court has identified as the north ditch.

$1,495 for a silt fence; $3,000 to clean out the north ditch; $33,578 to repair its seven fields for a total amount of $62,140.

{¶ 45} With respect to NCPS's "lost net profits," Firestone testified that he compared NCPS's profits before the incident occurred, with its profits after the flood. Firestone explained that in so doing, he removed any fixed costs and special events from the statements so that he could isolate the revenues and expenses that relate to NCPS's normal business activities. Firestone stated that he compared the average operating costs and average net income for the periods prior to the damage and subsequent to the damage. Firestone then calculated the difference in net profits subsequent to the damage with the average net profits prior to the damage and totaled the amounts from August 2007 through fall 2010. According to Firestone, NCPS sustained damages in the amount of $246,543 for "lost net profits." (Plaintiff's Exhibit 53, Exhibit 2.)

{¶ 46} Sweeney explained that NCPS operates league schedules in the spring and the fall as well as tournaments on weekends. According to Sweeney, NCPS can host 250 soccer teams on any given day. Sweeney explained that different age groups require different field sizes and that NCPS rotates the fields so that the grass wears out more evenly. Additionally, NCPS moves fields out of service to allow the grass to recover; however, Sweeney estimated that NCPS can use approximately 30 fields for games at any given time depending upon the type of configuration and the size of the fields.

{¶ 47} According to Sweeney, the size of NCPS's complex allows teams to play all their games at one location. Sweeney explained that NCPS is large enough for teams to schedule multiple games in one location, allowing the families to come to one location to see their children play rather than travel from one site to another. Sweeney testified that teams typically pay $400 for an eight game league and $500 for a tournament entry fee. Sweeney explained that as a result, tournaments are a big

revenue generator because it is common to schedule eight tournament teams for one field, which would generate $4,000 per tournament per field. Sweeney asserted that having more fields in one location allows NCPS to schedule more tournaments in one location and that it is not uncommon for teams to play multiple tournaments at the same time. Sweeney also stated that because of the size of NCPS's fields, it is able to fully accommodate large tournaments with teams from all over Ohio and surrounding states.

{¶ 48} Sweeney testified that as a result of the flood, NCPS lost the use of seven soccer fields. Although Sweeney admitted that NCPS did not lose a tournament because of the flood, he testified that NCPS was not able to host all of the games of the tournaments and leagues. Sweeney explained that when that happens, the fees simply go to the other locations where the games are held. According to Sweeney, hosting an event in such a way is difficult because many teams come from out of town and book hotels that may not be close to the fields to which the games get moved. Sweeney asserted that under such circumstances, NCPS cannot control the quality of the field conditions and cannot make a determination whether a game should be postponed or cancelled due to weather. Sweeney stated that control of these issues is an important factor in his business. According to Sweeney, local city parks provide 24 hour notice of game cancellations, at most, which means that parents and players may have already traveled to the area. On the other hand, NCPS typically does not cancel games unless the fields are unable to be used, which rarely happens. Sweeney did not state how many games were moved or cancelled on account of the flood damage.

{¶ 49} The court concludes that plaintiff is entitled to lost net profits for seven fields in the amount of $40,560.50 for its fall 2007 season, spring 2008 season, and fall 2008 season. (Plaintiff's Exhibit 53, Exhibit 2.) Plaintiff is not entitled to lost net profits for 2009 or 2010. Indeed, Sweeney testified that after repairing a field, it would not be used for approximately one year; however, he did not specify when the damaged fields were once again used or why it may have required an additional two years before the fields were ready for use. Moreover, plaintiff failed to present the court with any

evidence that its lost net profits in 2009 and 2010 were caused by the August 2007 flood rather than other economic factors.  In short, plaintiff proved only that it was entitled to damages for lost profits in 2007 and 2008 and failed to prove that it was damaged in 2009 or 2010 by the August 2007 flood.  Regarding the fall 2007 season and the 2008 spring and fall seasons, Sweeney admitted that NCPS did not lose any tournaments, but he did state that tournament and league games were lost.  He also testified convincingly, regarding the negative impact upon NCPS's business reputation that would result from the loss of even a few games. Based upon this testimony, the court finds that plaintiff's business reputation was harmed by the sudden and unexpected closure of fields.[6]

{¶ 50} In short, the court finds that the sum of $40,560.50 is a fair and equitable compensation for NCPS's lost profits.  Any greater award would be based upon speculation.  *Wagenheim v. Alexander Grant & Co.*, 19 Ohio App.3d 7, 17 (10th Dist. 1983) ("Damages * * * cannot be based upon mere speculation or conjecture, regardless of whether the action is contract or tort.")

{¶ 51} Turning to "opportunity costs," Firestone explained that he took the lost net profit for each soccer season, applied it to an interest rate, and rolled it forward to the date of trial. According to Firestone, such an opportunity cost totaled $27,527.

{¶ 52} Firestone testified that he used NCPS's mortgage rate since it is common for individuals to use the extra revenue to pay down a mortgage; however, he admitted that NCPS did not historically invest available cash.  Firestone acknowledged that business entities like NCPS typically distribute any available cash.  In fact, Firestone stated that NCPS historically distributes its available cash rather than invest or pay down debt.  Thus, the court concludes that plaintiff is not entitled to an award for damages for lost opportunity costs.

---

[6]Plaintiff's Exhibit 53 (exhibit 2) lists lost net profits of $51,696 for fall 2007; $25,334 for spring 2008; and $4,091 for fall 2008, totaling $81,121.

{¶ 53} For the foregoing reasons, the magistrate recommends judgment in favor of plaintiff in the amount of $102,725.50. ($62,140 in repair costs plus $40,560.50 in lost net profits and the $25 filing fee.)

{¶ 54} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
LEWIS F. PETTIGREW
Magistrate

cc:

Anthony J. Coyne
Brendon P. Friesen
55 Public Square, Suite 2150
Cleveland, Ohio 44113

Jeffrey L. Maloon
Randall W. Knutti
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

003
Filed March 30, 2012
To S.C. Reporter November 15, 2012